# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DSM HOLDCO, INC.; DEMOULAS SUPER MARKETS, INC.; and JAY K. HACHIGIAN, STEVEN J. COLLINS, and MICHAEL KEYES, in their capacities as Directors of the Board of DSM HoldCo, Inc. and the Board of Demoulas Super Markets, Inc., | ) ) ) ) ) ) ) ) | |
| Plaintiffs / Counterclaim Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 2025-1020-JTL |
| ARTHUR T. DEMOULAS, | ) ) | |
| Defendant / Counterclaim Plaintiff. | ) ) ) | |

## POST-TRIAL OPINION

Date Submitted: February 25, 2026
Date Decided: April 20, 2026

Rudolf Koch, John D. Hendershot, John Mark Zeberkiewicz, Kevin M. Kidwell, Brendan W. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harvey J. Wolkoff, Aliki Sofis, Alex del Nido, Taylor Comerford, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Boston, Massachusetts; *Attorneys for Plaintiffs and Counterclaim Defendants DSM HoldCo, Inc., Demoulas Super Markets, Inc., Jay K. Hachigian, Steven J. Collins, and Michael Keyes.*

Ashley R. Altschuler, Kevin M. Regan, Ryan D. Konstanzer, Alexander T. Dickinson, Anna F. Martin, Taylor A. Christensen, MCDERMOTT WILL & SCHULTE LLP, Wilmington, Delaware; Kevin R. Shannon, Berton W. Ashman, Jr., Daniel M. Rusk, IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Mark W. Pearlstein, Andrew C. Liazos, David Quinn Gacioch, MCDERMOTT WILL & SCHULTE LLP, Boston, Massachusetts; *Attorneys for Defendant and Counterclaim Plaintiff Arthur T. Demoulas.*

**LASTER, V.C.**

A brother, his three sisters, and their adult children share ownership of a storied and successful grocery store chain in New England. The brother ran the business profitably as CEO for nearly two decades, but he stubbornly resisted board oversight and excluded his sisters and their families from the business.

The sisters sought change. Over approximately five years, the sisters gradually replaced the CEO's longtime allies on the board with independent, outside directors. When the sisters introduced the first independent director, they thought he could work cooperatively with the CEO and his fellow directors to improve corporate governance and transparency. Two years later, nothing had changed, so the sisters introduced a second independent, outside director, believing that two directors might succeed where one had failed. The CEO opposed both directors, regarded them as his sisters' agents, and resisted their efforts. After the CEO responded to a meeting with the two directors by sending them hostile letters attacking them and copying all of the stockholders, the sisters added a third independent, outside director.

The three outside directors constituted a majority of the five-member board. Having witnessed the CEO's imperious style firsthand, they anticipated ongoing confrontations over long-term strategy and succession. For the company, it would be "déjà vu all over again"[1] and reprise a conflict from a decade earlier between the siblings and their cousins. In that prior incident, the CEO's obstinacy eventually

---

[1] Attributed to the baseball philosopher Yogi Berra. *See* Scott Stump, *'It's deja vu all over again': 27 of Yogi Berra's most memorable 'Yogi-isms'*, TODAY (Sept. 23, 2015), https://www.today.com/news/its-deja-vu-all-over-again-27-yogi-berras-most-t45781.

caused one of his supporters to switch sides, and the cousins used their newfound stockholder-level majority to establish a board majority and remove the CEO. He in turn fought back by leading a weeks-long employee walkout and customer boycott. Although his brinksmanship nearly destroyed the company, it ultimately forced a resolution in which the siblings bought out their cousins. Not only that, but the boycott and walkout ended up helping the company through increased brand loyalty.

The three directors desperately wanted to avoid a similar confrontation. To demonstrate to the CEO that they were serious about change, they drew up a list of straightforward governance issues and delivered it to the CEO during an executive session. The CEO did not respond constructively. Over the ensuing months, he made a few token gestures while aggressively digging in on the principal issues. When the three directors made specific requests, he took a hardline, passive-aggressive approach. The boardroom environment became toxic.

In spring 2025, the three directors heard rumors that the CEO's principal lieutenants were preparing for another employee walkout and customer boycott. They rationally concluded that the CEO was getting ready for a fight. Believing in good faith that another walkout and boycott would be disastrous for the company, they took action. They formed an executive committee consisting of themselves so that the CEO's remaining director ally would not be party to their deliberations. Then they suspended the CEO and key members of his team pending a law firm investigation.

The CEO escalated. Through intermediaries, he launched a social media campaign ridiculing the three directors and his sisters. That effort included a website

that posted their personal contact information, resulting in death threats. He also conducted a public relations campaign featuring statements to the press criticizing the directors and his sisters. When the *Boston Globe* ran an op-ed calling for a customer boycott, the campaign's social media account promoted it. The CEO also continued communicating with his lieutenants, who trespassed on company property to drum up support for the CEO. Meanwhile, the law firm investigation did not exonerate him.

The three directors attempted mediation. When that failed, the three directors terminated the CEO and filed this action to confirm the validity of their actions. The CEO asserted affirmative defenses and a counterclaim that contended the three directors breached their fiduciary duties when first suspending and later terminating him.

By the time of trial, no one disputed the legal validity of the directors' actions. The only disputes involved whether they acted equitably. On those issues, the CEO bore the burden of proof.

The CEO sought to prove that the directors breached their duty of loyalty by acting in bad faith to benefit his sisters and their families. He failed to carry his burden.

The record does not support a finding that the directors were beholden to the sisters. To be sure, they consulted with the sisters, took their concerns into account, and considered the stockholder-level disputes between the sisters and the CEO, but directors can legitimately do that. Here, the three directors rationally concluded—

one could say reasonably or fairly concluded—that the CEO's longstanding resistance to board oversight, imperious manner, and refusal to compromise with his sisters threatened the company. The CEO proved that he was a good operator and that the directors did not suspend or terminate him because of problems with the business. That, however, is not the only dimension of a CEO's job. Nor is it all that directors can consider.

The directors acted in good faith when initially suspending and later terminating the CEO. The business judgment rule protects their decisions. Judgment will be entered in their favor and against the CEO.

## I.    FACTUAL BACKGROUND

The facts are drawn from the post-trial record. The parties introduced nearly 500 exhibits and agreed on fifty-eight stipulations of fact. Six witnesses testified live at the three-day trial, and the parties introduced testimony from five other witnesses by deposition.[2] Having assessed the credibility of the witnesses and weighed the evidence as a whole, the court makes the following factual findings by a preponderance of the evidence.

### A.    Market Basket

After emigrating from Greece to Massachusetts, the brothers Athanasios and Efrosini Demoulas started the business known as Market Basket with a single store.

---

[2] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. Citations in the form "PTO ¶ __" refer to the Pre-Trial Stipulation and Order.

A century later, the business comprises ninety stores across New England, generates almost $8 billion in annual revenue, and employs over 30,000 people.

Market Basket's strategy prioritizes customers and employees. Exemplified by its slogan "More For Your Dollar," Market Basket strives to sell groceries at reasonable prices. Through benefits like an employee-profit-sharing plan, Market Basket takes care of its employees so they take care of customers. Those practices have led to fiercely loyal customers and employees.

## B.    The First Round Of Family Disputes

The founders' sons George and Telemachus continued the business, operating through an entity known as Demoulas Super Markets, Inc. ("Markets"). Their sons followed them. Telemachus's son is Arthur T. Demoulas, the defendant in this case.[3]

After George died unexpectedly, his branch of the family came to believe that Telemachus and his branch were attempting to take over Markets. In 1990, George's branch sued Telemachus and his branch. One lawsuit alleged that Telemachus and his branch had fraudulently transferred stock to themselves. Another lawsuit alleged that Telemachus and his branch had usurped corporate opportunities. Tempers flared at trial, sparking a physical altercation between Arthur and one of his cousins. The Massachusetts courts ruled for George's branch.

Despite those family disputes, the two branches managed Markets under a power-sharing arrangement. Markets' board had seven seats. Telemachus's branch

---

[3] For clarity, this decision refers to members of the Demoulas family by their first names, without implying familiarity or intending disrespect.

and George's branch each appointed two directors, and they jointly selected three independent directors.

## C.     The Second Round Of Family Disputes

In 2008, after working full time at Markets since the 1970s, Arthur took over as President and CEO. He proved to be an excellent operator, but an imperious leader. Arthur believes in top-down management control and sees little need for board oversight. As he told the Markets directors in 2012, "There's only one boss in the company. There's not two. There's not three. There's not five."[4] He viewed himself as the best judge of what served Markets' best interests, and he believed he had the power to take action without asking for the board's permission.[5]

Over time, Arthur's managerial style led to tensions with the board. In June 2014, a family member who traditionally supported Arthur switched to supporting George's branch, producing a stockholder majority. George's branch promptly replaced two directors, establishing a new board majority. The new board majority fired Arthur, citing his "failure to provide information to the Board, to appear before the Board, and to meet with members of the Board, as requested."[6]

---

[4] Arthur Tr. 703; *accord* JX 240 at 3.

[5] *See* JX 5 at 12 ("My management style, okay, is to do what's in the best interests of DeMoulas Super Markets . . . not to come back to this board to request and ask for permission.").

[6] JX 4 at 1; *accord* Arthur Tr. 663–65 (admitting he "didn't provide . . . the information that they were asking for at the time"); *see* Mulligan Dep. 118–19; Shea Dep. 312.

Arthur fought back by leading a weeks-long, highly public employee walkout and customer boycott. Many suppliers joined in by refusing to fill orders.[7] Most of the employees "were on the street," and "all the stores eventually closed."[8] Markets lost hundreds of millions of dollars in revenue,[9] and the losses nearly pushed Markets into bankruptcy.[10]

The walkout and boycott brought George's branch of the family to the table. In July 2014, Arthur proposed that he and his sisters—Frances, Glorianne, and Caren—buy out their cousins. In August, they reached a deal at $1.6 billion. The purchase was functionally a leveraged buyout funded by $1.6 billion in debt and conducted through a new holding company, DSM HoldCo, Inc. (the "Company"). The transaction closed in December 2014.[11]

Arthur and his sisters emerged from the transaction owning 100% of the Company's common stock, which in turn owned 100% of Markets. They elected a five-member board of directors (the "Board"), initially comprising Bill Shea, Terry

---

[7] PTO ¶ 44; *see* Arthur Tr. 666; JX 5 at 13–15; Trainor Dep. 66–68.

[8] Shea Dep. 33.

[9] PTO ¶ 45; *see* Mulligan Dep. 116 (testifying that the boycott and walkout affected the company's financial performance "dramatically" and quantifying sharp decrease in sales volume); *see also* Trainor Dep. 187–88; Shea Dep. 34.

[10] *See* Hachigian Tr. 49; Collins Tr. 411, 458.

[11] PTO ¶¶ 41, 46–49; Arthur Dep. 203–04.

Carleton, Chuck Roazen, Ed Pendergast, and Robert Paglia. All but Paglia had served on the Markets board before the schism.

With the support of his sisters and the Board, Arthur returned as CEO. He claims he had nothing to do with the walkout or boycott, but his ability to say that results from efforts at plausible deniability. Technically, Arthur never told his top lieutenant "to have any store doors locked,"[12] but he asked him more than once whether they "would . . . be able to get the store managers to lock the doors if [Arthur] was fired by the other side of the family."[13] Contemporaneous news sources reported that the uprising was "orchestrated from the top."[14] And after his reinstatement, Arthur gave a thank-you speech to a crowd, standing in the bed of a pickup truck behind a sign that read, "Thank you! To our valued Customers, Your loyalty, support and sacrifice over the Summer of 2014 will never be forgotten by our Associates. The Market Basket you know is back, and more committed than ever before to serve you."[15] Arthur did not direct the walkout and boycott in the same way that Henry II never ordered his knights to kill Thomas Becket.[16]

---

[12] Trainor Tr. 537.

[13] *Id.* at 533–34.

[14] JX 502 at 1; *see* Hachigian Tr. 49–51.

[15] JX 136 at 5; *see* Shea Dep. 317 (recalling that "Arthur got up on a truck or something with a megaphone and started talking").

[16] *See* Lloyd de Beer & Naomi Speakman, *Thomas Becket: the murder that shook the Middle Ages*, *The British Museum* (Dec. 28, 2019), https://www.britishmuseum.org/blog/thomas-becket-murder-shook-middle-ages.

**D.   Collins Joins The Board.**

After returning to the CEO position, Arthur resumed his "one boss" style. He also began to distinguish between the "working shareholders" and "non-working shareholders." His sisters felt excluded.[17] The Board, however, supported Arthur.[18] The Board also installed Andrea Batchelder, Arthur's personal lawyer, as corporate secretary.[19]

After years of asking Arthur to moderate his approach, the sisters decided to introduce a new director, hoping that would help Arthur change his tune. At that point, each owned a little more than 20% of the stock. Arthur owned around 30%. A trust for the siblings' fourteen children owned the remaining 10% (the "Family Trust").[20]

---

[17] *See* JX 12 at 2.

[18] *See* Arthur Tr. 711–12 (testifying that he could not "think of anything" those directors "voted against that [he] wanted to do").

[19] *See* Arthur Dep. 292–93, 297–301; Batchelder Tr. 737–38, 780–91; JX 3 at 19 n.21; JX 518 at 71–72; JX 519 at 2–3.

[20] The actual figures were 20.4% for each sister, 28.4% for Arthur, and the balance to the trust. The siblings had all engaged in estate planning, resulting in some of their shares being allocated to other trusts or gifted to immediate family members. *See* PTO ¶ 47.

By virtue of their collective ownership, the sisters controlled a majority of the voting power.[21] They decided in 2019 to replace an older director with a fresh voice.[22] Glorianne wanted someone who could make the Board "a little more professional and a little more independent."[23] Caren wanted someone who would take a long term perspective to secure "the health of the company . . . over the next fifty years."[24] Frances wanted someone who would "set[] up processes" to help the Company as ownership transitioned to "the future generation[s]."[25]

The first new director was Steve Collins, the founder and managing director of Exeter Capital, a Boston-based investment firm.[26] Collins previously worked as a

---

[21] This decision refers to the sisters collectively for convenience. Both in this litigation and in the press, Arthur has attempted to portray his sisters as a unified block who are attempting to take the Company for themselves and their children. In reality, the sisters are aligned on some matters and not on others, and they did not always agree. Each had their own motives for acting, even though they voted together over time to place new directors on the Board. *See* JX 12 at 3 (Glorianne writing to Arthur to reject his belief that she "sided with Frannie at your expense"); JX 21 at 2 (Glorianne writing to Arthur that "Frannie[']s accusations can be quite *far from reality*, even when at times her concerns may have some basis in reality"); JX 851 at 6, 50–51, 87 (text messages between Frances and Caren reflecting lack of complete agreement with Glorianne); *see also* JX 850 at 2 (Hachigian text message to Frances: "[P]lease do not involve your sisters now. I need to meet w[ith] your brother first.").

[22] *See* JX 14 at 1; Glorianne Tr. 388–89; Caren Tr. 293–95; Frances Dep. 65–66.

[23] Glorianne Tr. 389.

[24] Caren Tr. 287–88, 293–95; *see* Glorianne Dep. 117–18, 346–48; Frances Dep. 129–30.

[25] Frances Dep. 122–24.

[26] Collins Tr. 408, 412.

managing director at Advent International, a financial consulting firm. He is a veteran board member, having served on approximately fifteen boards.[27]

Caren and her husband met Collins through one of his former partners at Advent International.[28] Before that meeting, Collins had no connection with any of the sisters or their families.[29] The sisters met with Collins to evaluate his potential as a director. They valued his retail experience and thought his "mild demeanor" would make him a "good person to work with [their] brother."[30] Arthur refused to meet with Collins and opposed having him join the Board.[31]

Collins joined the Board on February 8, 2019, replacing Paglia.[32] That same day, Caren texted Collins: "[T]hank you again for your desire to help us move in the same direction."[33]

On February 21, 2019, Glorianne sent a handwritten letter to Arthur explaining her reasons for adding Collins to the Board:

---

[27] *Id.* at 408–10.

[28] *Id.* at 412; *see* PTO ¶ 27.

[29] Collins Tr. 413.

[30] Caren Tr. 288; *see* Frances Dep. 65–68; Glorianne Dep. 108–09; Collins Tr. 412–14; JX 14; *see also* Shea Dep. 95–96 (describing Collins' credentials as "first class").

[31] Collins Tr. 415; Glorianne Tr. 388–89; JX 81 at 1.

[32] JX 13 at 2; Glorianne Tr. 390; Collins Tr. 415–16.

[33] JX 13 at 2.

11

First and most importantly, I wanted to say again that I think you are doing a tremendous job running our family company and managing lots of extremely challenging dynamics. . . . I am a 1000% supportive of you and your leadership and proud of the work you have done. . . .

It is important for you to know that support doesn't mean Blind Compliance. As an owner and custodian of the family company and more importantly of dad's legacy, I feel a responsibility to make decisions that I feel are best for the company, such as having fresh voices on the Board which is simply good governance. . . .

I think you know that dad's legacy, our family company, means as much to me than anyone. . . . The *irony* is that we, the four siblings, are being hypocritical now. I think what we need most right now is to trust each other the way we treat our associates and customers, and as our leader I am *pleading* with you to lead us in doing just that. . . . I have two *primary* concerns. *Communication* and *Inclusion. Please* Artie, as our leader you must try to foster more open communication between the four of us. . . . I am pessimistic about how things will proceed moving forward between the family without efforts in those two areas.

I can't believe I have to write to you to be heard—but I'll do whatever I have to to fight for my family.[34]

Although articulated by Glorianne, that letter accurately captures the sisters' primary motivations for electing Collins.

To the sisters' and Collins' disappointment, adding Collins to the Board had little effect on Arthur. In January 2020, one year later, Glorianne sent Arthur another handwritten note, this time with several requests:

. . . I know it has been awhile since my last letter, and you have not responded to either of them. Nevertheless, I know you have read them so I wanted to continue communicating privately with you this way because I think it is crucial for us to have some sort of dialogue if we are to avert yet another crisis within the company. . . .

---

[34] JX 14 at 1–3.

12

Caren is devastated by your silence. She has always worshipped you, to a fault and is struggling with your absence in her life. Please Please Reach out to her. . . .

I think if you just *overcommunicate* it will settle everyone down. Towards this end, I have tried to think of actionable ways to communicate that I am suggesting privately to you. Here is a list of ideas that I think would help and would not intrude in anyway on your leadership and management of the company. In fact, most are simply related to recognition and sharing basic information. So, with that in mind, I would encourage you to consider:

- Attending the annual shareholders meeting
- Inviting owners to the profit sharing and employee bonus meetings
- Including owners in the annual letter to employees
- Informing owners about employee milestones and inviting them to retirement ceremonies if and when they happen.
- Informing other owners about new store locations once they are secure from any threats from competitors. . . .
- Providing an annual update to the children of other owners.[35]

Those were reasonable and straightforward asks, made respectfully by the holder of 20% of the Company's stock, in an effort to create a better relationship between the CEO and the holders of a majority of the Company's stock. Arthur ignored them.

### E.   Hachigian Joins The Board.

After seeing nothing change for a year, Caren asked her estate-planning attorney for names of lawyers who might help with a corporate governance situation.[36] One of the names he offered was Jay Hachigian, a name partner with Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP, who founded the

---

[35] JX 21 at 1, 3–4.

[36] Hachigian Tr. 8–9; Caren Tr. 289–92.

firm's Boston office. Hachigian is a corporate lawyer with extensive experience advising boards of public and private companies.[37] It turned out Caren was already friendly with Hachigian—they were neighbors, their children had attended the same schools, and Caren had gone to high school with Hachigian's wife—but she had not known what Hachigian did for a living.[38]

After talking with Hachigian about the Company, Caren decided that he could be more helpful by joining Collins on the Board.[39] Hachigian did not immediately agree; he wanted to speak with the other sisters to get a better sense of the situation. Neither Glorianne nor Frances knew Hachigian previously.[40] They conveyed their unhappiness with "the way they were treated as significant shareholders of the [C]ompany."[41] They felt "frozen out" even though they owned a majority of the stock.[42]

The sisters were impressed with Hachigian's credentials and believed his "great communication skills" could "bridge the divide with Arthur."[43] Hachigian

---

[37] PTO ¶ 28; Hachigian Tr. 6–7.

[38] Hachigian Tr. 8–9.

[39] *Id.* at 9–10.

[40] *Id.* at 10; Frances Dep. 76; Glorianne Dep. 116–17.

[41] Hachigian Tr. 12–13; *see id.* at 155–56.

[42] Hachigian Tr. 13.

[43] Frances Dep. 76–78; *see id.* at 91–92, 99; Caren Tr. 291; Glorianne Dep. 131, 135–37; JX 38 at 2; *see also* Shea Dep. 105 (testifying Hachigian's experience was "impressive" with "no reason not to have him on the board").

believed that he could help by proposing corporate governance best practices and improving transparency.

By late October 2020, the sisters had decided to put Hachigian on the Board.[44] Arthur opposed his nomination and refused to meet with him.[45] Arthur regarded the sisters' efforts as an assault on his management of the Company.[46]

In early 2021, the sisters removed Roazen (then in his nineties) and filled his seat with Hachigian.[47] In February, Hachigian and Collins learned from Frances that she had a list of governance items that she wanted to pursue, including having her son, Michael, "at the top of the list" if anything happened to Arthur.[48] Those were Frances' issues. They were not Collins' issues or Hachigian's issues. They were not even Caren or Glorianne's issues. Although Collins acknowledged that "[m]anagement of the next generation" was a recurring theme for the sisters and their families,[49] that was understandable. The Company was a family business, and generational transitions can be difficult.

---

[44] *See* JX 28 at 1; JX 35 at 2.

[45] *See* Hachigian Tr. 16–19; JX 28; JX 81 at 1.

[46] *See* Caren Tr. 288 ("[M]y brother was always threatened with any board member that he didn't put on himself . . . ."); Caren Dep. 66 ("[H]e was very, very upset that we were going to put anybody on the board."); Glorianne Tr. 388–89 ("I remember it like yesterday . . . . [H]e was very disturbed with me.").

[47] Hachigian Tr. 22.

[48] JX 833 at 1; *see* Collins Tr. 501–03.

[49] JX 833 at 1.

15

After Hachigian joined the Board, he tried to build a professional relationship with Arthur, as had Collins before him.[50] Arthur refused to give out his cell phone number, told them that he did not use email or text, and limited their interactions almost entirely to Board meetings.[51] When Collins suggested holding a dinner on the night before each Board meeting, Arthur did not even respond.[52] Arthur also did not want the directors visiting headquarters.[53] Through his actions, Arthur made clear that he "did not want [Collins and Hachigian] on the board and was unwilling to communicate with [them]."[54]

## F.     The Non-Tax Distributions

Because the Company is a Subchapter-S corporation, it makes regular distributions to cover stockholder-level tax obligations. The Board sometimes approved non-tax distributions in addition to the tax distributions.[55]

---

[50] Hachigian Tr. 38–39; *see* Collins Tr. 416–17.

[51] Hachigian Tr. 38–39; Collins Tr. 416–17; *see* Arthur Tr. 718.

[52] Collins Tr. 419–21.

[53] *See* Hachigian Tr. 35–36, 117–18.

[54] Hachigian Tr. 38–39; *accord* Collins Tr. 416–21.

[55] Hachigian Tr. 207–08.

Arthur preferred not to make non-tax distributions; he prioritized paying down debt and making capital expenditures for growth.[56] The sisters generally agreed.[57] By summer of 2021, however, Frances and Caren thought the Company had the financial strength to make non-tax distributions. They proposed that the Company distribute a total of $230 million over the next three years.[58]

In response to their proposal, Arthur and the Company's CFO prepared a schedule showing projected cash flow from operations for each year from 2021 to 2025 and proposing how to allocate the cash flow to debt, capital expenditures, and distributions.[59] The Board, Arthur, and the sisters reached a consensus on the cash flow allocations, including the $230 million in distributions over three years.[60]

The consensus suggested that with communication and transparency, Arthur and the sisters could coexist. But that example proved the exception.

## G. The Succession Issue

After the success on distributions, Arthur moved in the opposite direction by raising one of the most sensitive issues for the family: management succession. He

---

[56] *See* JX 60 at 3–5; Collins Tr. 504.

[57] Frances Dep. 109–10; Glorianne Dep. 168; Caren Tr. 295–97.

[58] JX 57 at 1.

[59] *Id.* at 2.

[60] Collins Tr. 504–05; JX 61 at 1–2.

17

told the Board that either his daughter Madeline or his son T.A. would succeed him. Both were in their early thirties.

For Collins and Hachigian, Madeline and T.A. were not only young and inexperienced, but also unknowns. Arthur had never brought them to meetings or introduced them to the directors. After Collins and Hachigian asked to have them attend meetings and make presentations, Arthur refused.[61] Collins and Hachigian inferred they were not ready, because otherwise Arthur would have brought them.[62]

From discussions with the sisters, Hachigian and Collins knew that succession was a hot-button issue. They concluded that if they did not take action to mediate between Arthur and his sisters, the families would be on a collision course.

## H. The Governance Initiatives

In August 2022, Hachigian prepared a document titled "Market Basket – Board Governance Initiatives" (the "Governance Initiatives").[63] It reflected his own insights, input from Collins, and feedback from meetings with the sisters and their families.

---

[61] *See* Hachigian Tr. 31–33; Collins Tr. 441–43; *see also* Arthur Tr. 673; Batchelder Tr. 797–98; Shea Dep. 65–66, 307.

[62] Hachigian Tr. 32–34. The Company's CFO agreed that neither Madeline nor T.A. was prepared to become CEO. Mulligan Tr. 829–30. Arthur acknowledged at trial that both were inexperienced. Arthur Tr. 674–76.

[63] JX 111 at 3; *see* Hachigian Tr. 157–59.

The first Governance Initiative was discretionary distributions for 2023 and 2024.[64] Because everyone agreed that capital expenditures should take priority, the topic was inextricably linked to the need for information about capital expenditures, including the plan for a new distribution center. Collins noted that "[p]rovid[ing] some transparency to the stockholders" would "alleviate some concerns."[65]

A second Governance Initiative involved the Board's desire to hear from other members of management. Only Arthur attended Board meetings. On this issue, Hachigian wrote:

> We need to hear from more of the CEO's lieutenants. Pick one or two per board meeting and would be great to hear and learn from: Head of Store Operations – David McLean; Head Merchant/Buyer; Head of Leasing; Head of Supply Chain; Head of HR; Head of Facilities. Would very much welcome hearing from these people. At a higher level, if the Board does not hear from anyone else at the Company we have to ask about the proper function of the Board and our ability to assist with succession.[66]

Because Arthur had raised the issue of succession and identified his children, Hachigian and Collins regarded this Governance Initiative as critical.

Another Governance Initiative concerned the "Next Generation of Shareholders."[67] Collins and Hachigian wanted to "[d]iscuss stockholder/board

---

[64] JX 111 at 3.

[65] *Id.*

[66] *Id.*

[67] *Id.*

19

interactions and transition to a process that can be enduring beyond the term of this board."[68]

A final Governance Initiative concerned the employee profit-sharing plan. Only Arthur and Shea were trustees. Hachigian and Collins viewed this item as an "easy way to provide some inclusion."[69]

Over the next year, Hachigian and Collins worked on the Governance Initiatives with Arthur, although they did not give him the list. By March 2023, Frances wanted stronger action, particularly on the Company's strategic direction and capital investments.[70] She asked Hachigian to attend a meeting at her home with her sisters and Shea. She also wanted to consider appointing another director.[71] But

---

[68] *Id.*

[69] *Id.*

[70] *See* JX 850 at 1 ("It is long past time that we have a more comprehensive discussion about all the issues in person with the three shareholders and [B]ill perhaps in Boston at my home. . . . But we also need a closer look at everything in concert. For instance we are putting another store in Maine north of Portland. In this atmosphere it is incumbent upon the board to ask the basic the basic question of why. We cannot hire in Maine. Even North Conway is a huge labor problem. The expenditure of the build is very similar to a more populated area so I want the board to look at a more efficient use of this capital expenditure. Although this oversight and scrutiny has not been part of what the board has done in the past it must change its habits of conduct now.").

[71] *See id.* at 2 (texting Hachigian about acting through written consent).

Hachigian favored a more measured approach. He asked Frances to wait until he had another meeting with Arthur.[72] Despite her frustration, Frances agreed.[73]

In May 2023, Hachigian and Collins met with Arthur at the Company's headquarters to address "friction and tension that was building" between Arthur and his sisters.[74] Hachigian suggested that as a show of good faith, Arthur step down as a trustee of the Family Trust.[75]

Rather than taking a constructive step, Arthur escalated.[76] He sent two letters to Collins and Hachigian, copying all stockholders, that made it abundantly clear that he did not want them as directors.[77] He accused Collins and Hachigian of "disregard for the [Company's] fundamental business philosophies"[78] and claimed they would

---

[72] *Id.* ("Ok. But please do not involve your sisters now. I need to meet w your brother first. There is a process I need to get through before we move to this step. It's fine to be ready but please do not involve anyone else. Thx.").

[73] *Id.* at 3 ("It's impossible to be passionate [about the Company's employees] and feel like you truly make a difference when the . . . message [is] do as I say or else. I want to be hopeful regarding a show of respect and inclusion for the next generation but the window is almost closed. What does Arthur plan to gain with his lackluster positioning. Ask him. Game over.").

[74] Hachigian Tr. 118.

[75] *Id.* at 184.

[76] Collins Tr. 455–56 (describing Arthur as taking "two steps backwards").

[77] *See* JX 81; JX 84; JX 520.

[78] JX 81 at 2.

"erode and eventually destroy" the Company.[79] Collins felt as if years of effort had been undone.[80]

## I.     Keyes Joins The Board.

When Arthur sent his hostile letters, there was already a Board vacancy. In March 2022, Pendergast had resigned at the age of ninety.[81] Neither the Board nor the stockholders took action to replace him.

After Arthur's hostile letters, the sisters began looking for a director. Caren's husband suggested Michael Keyes, whom he had met on a real estate deal in 2021.[82] Keyes did not know any of the sisters.[83]

Keyes has thirty years of experience in the real estate industry, and he currently serves as Senior Director of Acquisitions at Intercontinental Real Estate Corporation, a family owned company. Each sister met with Keyes, as did Hachigian and Collins. They thought his real estate expertise would be valuable, because unlike its competitors, the Company owns the real estate where eighty of its ninety stores

---

[79] JX 84 at 1.

[80] Collins Tr. 455–56 ("I thought it was a bad direction we were going in."). At trial, Arthur called his letters "constructive." Arthur Tr. 708. They were not.

[81] JX 68 at 4; Shea Dep. 133–36.

[82] Keyes Tr. 317–19.

[83] *Id.* at 316.

22

are located, and its principal capital expenditures involve real estate.[84] They also liked his experience working for a family-owned company and his local roots.[85]

The sisters asked the other two directors—Shea and Carleton—to meet with Keyes, but they dragged their feet.[86] In October 2023, the sisters acted by written consent to elect Keyes to the Board.[87]

With Keyes on the Board, Frances wanted to bring Arthur to the negotiating table. She texted Caren:

> [W]e need a more complete strategy. Example remove [Arthur] from all the entities as managing partner. Remove real estate stranglehold. Two major steps under board control. To have [Hachigian] and [Glorianne] meet concerning removal seems counterproductive. We have taken incremental steps all along need to do the same. [W]e should act quickly but must be strategic and smart and the goal line clearly.[88]

To a lesser degree, Caren agreed. But they did not control the directors. Hachigian and Collins took a more deliberate and measured approach.

---

[84] *See id.* at 321–22; Hachigian Tr. 24; Caren Dep. 156–58, 161; Glorianne Dep. 176–78; Frances Dep. 125–27.

[85] *See* Frances Dep. 127–28; Glorianne Dep. 176–78.

[86] *See* JX 88 at 1 (Frances texting Hachigian: "No more delays if they are not going to make contact let's get the paperwork in the pipeline and take action. Bill [Shea] and [T]erry [Carleton] can always meet him at a later date. We have more pressing issues to discuss and cannot afford to let them run the tables. They have had ten years to be inclusive. That is more than gracious now it is just nonsense.").

[87] PTO ¶ 29; JX 89; Caren Dep. 159; Hachigian Tr. 190.

[88] JX 851 at 6.

## J.    The December 2023 Board Meeting

The next Board meeting took place in December 2023.[89] Arthur did not bring anyone else from management to the meeting. He presented on the Company's third-quarter financial performance and on current and planned capital expenditures. He also reported that the Company would likely spend $80 million on capital expenditures in 2023, which was less than projected, and $130 to $200 million in 2024.[90]

At the meeting, Hachigian proposed that the Board make non-tax distributions totaling $200 million during 2024. The Board voted unanimously in favor.[91]

Hachigian next proposed that the Company enter into indemnification agreements with the directors.[92] Hachigian believed agreements were customary,[93] but he also anticipated disputes with Arthur, including the possibility of litigation.[94]

---

[89] JX 92.

[90] *Id.* at 2. During their text exchanges about Keyes, Frances had raised the issue of distributions for 2024. Hachigian responded, "We can address distributions after we get Keyes on the board." JX 88 at 1. And he did.

[91] JX 92 at 4.

[92] *Id.* at 5; *see* JX 831 at 3.

[93] Hachigian Tr. 194 (testifying that it was "entirely unusual for board members of a company of this size to not have indemnification agreements").

[94] *Id.* at 193 (noting that "[t]he board was already having issues with Mr. Demoulas" and that "the fact that Mr. Demoulas was unwilling to cooperate with the board could result in actions whereby the directors would want to . . . have indemnity agreements with the company").

Hachigian only mentioned the former reason, not the latter.[95] The Board did not move forward with indemnification agreements.

During a break, Keyes made small talk with a couple family members who were attending as observers. Arthur snapped that he was "not to fraternize with nonworking shareholders."[96]

After hearing about the meeting, Frances and Caren discussed the possibility of removing Shea from the Board. Glorianne did not want to go that far, but Hachigian agreed that it should be an option.[97] As matters turned out, no one took action against Shea until March 2025.

## K. The April 2024 Board Meeting

The next Board meeting took place on April 2024. As it did every year, an agenda item was whether to award Arthur a bonus and a raise. In each of the

---

[95] When Carleton asked him why the agreements were needed, Hachigian did not respond. Carleton Tr. 864–65.

[96] Keyes Tr. 324–25. At trial, Arthur rejected Keyes' account as "[a]bsolutely, absolutely false." Arthur Tr. 593–94. Arthur's testimony on that point was not credible. Keyes' testimony was credible.

[97] See JX 851 at 50 (Frances texting Caren, "[Hachigian] proceeded to tell me that he got [Glorianne] glo to agree to sheas removal and jay doesn't want him at the April meeting and that he was now going to call Steve."); id. at 51 (Caren responding to Frances, "I haven't spoken to glo but I am happy we are where we are. I don't plan to say a word. But this is progress. Thank God she realizes there is no pleading with the brother to be nicer and more communicative. I'm not sure if we'll be ready to vote Bill off by the April meeting but at least things are moving. We can't go on like this anymore. The abuse is untenable. At least we're no longer playing defense.").

preceding three years, the Board had unanimously approved both based on the Company's strong performance.

In early 2024, the Board's compensation committee (the "Compensation Committee") consisted of Hachigian and Carleton. They were charged with reviewing Arthur's performance and making a recommendation to the Board. As in prior years, they recommended a significant bonus and a raise. During the Compensation Committee's discussions with Arthur, Hachigian did not raise any governance issues, such as a failure to provide information to the Board. During the Board meeting, the directors unanimously adopted the Compensation Committee's recommendation; no one raised any governance issues.

Arthur came out of the discussion believing his position was secure. He thought—and maintains—that if there were any issues with his performance, the directors would have raised them during the April 2024 meeting, reduced his bonus, or denied him a raise. But for the directors to take action on Arthur's salary and bonus would have been highly provocative. Hachigian believed that the Company's "financial performance was strong," so he wanted to compensate Arthur accordingly.[98] That did not mean that everything was hunky-dory.

Instead, during the April 2024 meeting, a dispute arose over how to refer to non-tax distributions. Although the Company had not been consistent in using a particular term, Batchelder most often referred to them in the minutes as

---

[98] Hachigian Tr. 202.

extraordinary distributions. After the December 2023 meeting, Hachigian proposed calling them income distributions.[99] When the issue came up again in April 2024, Hachigian reported that under Massachusetts trust law, calling them "extraordinary distributions" meant they would be treated as principal for the Family Trust, rather than as income that would flow to the beneficiaries.[100] Arthur and the trust beneficiaries were embroiled in litigation over distributions and other issues, and Hachigian argued that the Company should not be influencing that litigation.[101]

Arthur believed that Hachigian was trying to help his sisters in the trust litigation. To some degree, that was unavoidable. Because the existing designation favored Arthur's position, any more neutral term would benefit the other side. In reality, Hachigian just wanted a neutral term. The issue nevertheless left Arthur firmly—though inaccurately—convinced that Hachigian was his sisters' tool.

## L. Hachigian and Collins Consider Alternatives.

After the April 2024 meeting, Hachigian and Collins took stock. Collins had been on the Board since 2019 and had tried to work constructively with Arthur since then. Hachigian had joined the Board in 2021 and worked together with Collins on those efforts. They had tried to improve the Company's corporate governance and the

---

[99] *See* JX 97 at 1; JX 96 at 1; Batchelder Tr. 749–50. Hachigian told Keyes to approve only the revised version of the minutes that reflected the change. JX 96 at 1; JX 97 at 1. Keyes did not initially understand the issue, but eventually got it and supported Hachigian's revision. JX 98 at 1; JX 99 at 1; Keyes Tr. 354–57.

[100] Hachigian Dep. 335–38; JX 108.

[101] JX 110 at 4; *see* Hachigian Dep. 335–37; Carleton Tr. 896.

relationship between Arthur and his sisters. Their efforts had failed. Instead, after meeting with Arthur in August 2023, he had attacked them. Even with Keyes on the Board, Arthur showed no sign of relenting. The sisters were losing patience, and the likelihood of a serious stockholder-level conflict was growing.

To brainstorm about next steps, Hachigian and Collins met with Robert Kirby, Glorianne's lawyer. Before the meeting, Hachigian and Collins each shared their thoughts.

Hachigian's document identified four "DSM Alternatives."[102] The first was "Do Nothing," which meant accepting Arthur's plans for the Company, including on succession. One benefit was that it "[a]voids publicity now," but it meant the confrontation would be "merely shifted to a later date and a different generation."[103]

A second option was to "Sell the Entire Company to a Third Party."[104] Hachigian did not think that option was viable because it would require all four families to consent, which was "not realistic now."[105]

A third scenario involved a "Sale of a Family's Interest" either to the Company or a third party.[106] The former would require the Company taking on debt, unless the

---

[102] JX 112 at 2.

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.* at 2–3.

28

Company found an equity partner, but Hachigian felt that "finding an institution that would invest $1.2B with the current governance is not likely."[107] A family selling to a third party would also likely create a rift with unforeseeable consequences.[108]

The last option was "Effect Succession Now."[109] Considerations included "Likelihood of significant negative publicity"; "Possibility of litigation"; "Possibility of significant operations disruption, but lower risk than doing this later"; "Resolves strife among three Families"; "Creates opportunity for all Families"; and "Leaves enough time for next generation to become responsible owners and learn the skills needed to expand the business over the next 30 years."[110] Taking action also would enable the Board to "[e]xercise control over CEO selection to ensure a good long-term choice."[111]

Collins presented his thoughts in the form of a report card on Arthur's performance:

> -Efficacy and overall mgmt of the brand, sales, EBITDA, real estate, team, minimum wage, C19, capital structure, etc. The overall mgmt. of the business ~ $7B sales; 90 stores; $620M EBITDA; $2B of real estate. Entity value at or above $4.8B. I would give the grade of: A

---

[107] *Id.* at 3.

[108] *Id.* ("Once a Family sells, there is no going back. . . . Don't underestimate the emotional and family dynamics of such an outcome.").

[109] *Id.* at 4; *see* Hachigian Tr. 195–200.

[110] JX 112 at 4.

[111] *Id.*; *see* Hachigian Tr. 199–200.

-Distributions – lot of back and forth on this over the years; and the 2014 buyout; margins; interest rates; new stores; Foundation debt/estate. Lot of pieces to this but the company has committed to $30M/$100M/$100M/$200M/$200M for 2021 to 2025 ($630M). You could distribute more for sure; but after a lot of haggling, overall I would give a grade of: B

-Stewardship of the family; inclusiveness; positivity; succession; TAD trust; communication; overall I would give a grade of: D.[112]

Collins did not identify specific actions to be taken.

No one acted hastily. At Glorianne's urging, they decided that before doing anything, they would ask Shea, Arthur's closest friend on the Board, to help convince Arthur to be constructive. Glorianne was the sister most interested in reaching a peaceful resolution with Arthur.[113] She anticipated that "at the end of this, . . . it would be possible that my brother would be terminated" and she "wanted desperately to help my brother."[114] With Shea, they would try to reach agreement on a list of simple action items that Arthur could undertake to ease tensions.

## M.     The August 2024 Alignment Meeting

On August 8, 2024, Glorianne, Kirby, Hachigian, and Shea met at Hachigian's office to "get alignment."[115] They identified "exactly what [the directors] needed from

---

[112] JX 111 at 1; *see* Collins Tr. 482–83.

[113] Glorianne Dep. 260; *see* JX 12; JX 14; JX 21.

[114] Glorianne Dep. 231–34, 260.

[115] Hachigian Tr. 40–42; *see* Glorianne Tr. 398–402; Shea Dep. 190–93; Glorianne Dep. 238; JX 124.

Arthur and from the company"[116] and reached a "consensus" on next steps.[117] Shea committed to support the consensus "[n]ot fewer than three times."[118]

Hachigian undertook to reduce their agreements to a list that could be presented at the next Board meeting. Hachigian prepared a document titled "Board/CEO matters" that memorialized the agreed-upon items.[119] After the alignment meeting, Hachigian learned that Arthur was planning to celebrate the 2014 walkout and boycott, so he added an item prohibiting "promot[ing] or otherwise participat[ing] . . . in any activity" celebrating those events.[120] Hachigian and Collins both feared "history repeating itself."[121] Hachigian briefed Keyes on the list.[122] He did not loop in Carleton.[123]

Shea gave Arthur a heads-up about the plan to present an issues list.[124] Arthur told Shea he "wasn't happy" because the items included "things that he didn't think

---

[116] Hachigian Tr. 39.

[117] *See id.* at 39–41; Glorianne Tr. 398–402; Shea Dep. 333–34, 339.

[118] Hachigian Tr. 41–42; *accord* Glorianne Dep. 236–37.

[119] JX 129; *see* Hachigian Tr. 43; Collins Tr. 424–25.

[120] JX 129 at 3; *see* Hachigian Tr. 211.

[121] *See* Hachigian Tr. 48–53; Collins Tr. 410–11, 456–57.

[122] *See* Keyes Tr. 361.

[123] Carleton Tr. 871.

[124] Shea would only concede that Arthur found out about the list. *See* Shea Dep. 342–43. There is no one else who would have told him.

the board needed to spend their time on."[125] He told Shea that the time had come to decide "who was going to run the company."[126]

## N.    The August 2024 Board Meeting

The Board met on August 22, 2024. Arthur did not bring any other members of management with him. After he presented on Company operations and capital projects, Hachigian moved to continue the meeting in executive session with only the directors and David Klebanoff, the directors' lawyer, present.[127] Hachigian moved to replace Batchelder, the corporate secretary, with Klebanoff for purposes of the executive session. When challenged, he said he believed that Batchelder had a conflict of interest because she was Arthur's personal attorney.[128] Hachigian, Collins, and Keyes voted in favor, and Shea and Carleton voted against, so the motion carried.

In the executive session, Hachigian informed the directors about "continuing unhappiness among all shareholders (other than Mr. Demoulas and his family) about

---

[125] *Id.* at 343.

[126] *Id.*

[127] JX 128 at 4.

[128] *See* JX 150. Hachigian said the executive session would concern "a family matter." *See* JX 812 at 6; Batchelder Tr. 754–55. That was loosely true: In a family-owned company, CEO performance and potential succession is a family matter. Hachigian understandably wanted to have a private executive session, without Batchelder present, and without having to explain himself fully in advance. His reference to "a family matter" was not problematic.

32

several circumstances, policies and processes at the Company."[129] He handed around the document titled "Board/CEO Matters" that he had prepared (the "Issues List").

The Issues List identified five items:

- Arthur would provide annual and quarterly forward-looking budgets for 2024/2025 (the "Budget Issue");

- Arthur would present capital expenditure projects in excess of $10 million for Board approval before making any commitments (the "CapEx Issue");

- Arthur would bring the heads of key business areas to present at Board meetings (the "Management Team Issue");

- The Company would not celebrate the 2014 employee walkout and customer boycott (the "No Celebration Issue"); and

- Leadership of the Company would not pass to Arthur's children; instead, Arthur would help the Board find a "qualified successor to be ready to assume leadership in the future" (the "Succession Issue").[130]

Four of the issues were from the alignment meeting. Hachigian had added the No Celebration Issue.

Carleton had not seen the list before. He immediately focused on the Succession Issue and recommended that it exclude the "next generation" as a whole.[131] Hachigian agreed that was the intent.[132]

---

[129] JX 129 at 1.

[130] *Id.* at 3.

[131] Collins Tr. 510–11.

[132] *See* Hachigian Dep. 228–29; Carleton Tr. 872–73.

Hachigian proposed that the Board invite Arthur into the session to discuss the Issues List. The directors agreed on inviting Arthur into the session and having a discussion. They disagreed over whether to give him the Issues List. Hachigian, Collins, and Keyes voted to give him a copy. Shea and Carleton voted against giving him a copy. Shea had tipped off Arthur and knew he would not be happy.[133] Carleton worried that Arthur would react badly to the wording and find the Succession Issue insulting because it only referenced his family. Carleton also disagreed about including the No Celebration Issue.[134]

The majority prevailed. The directors called Arthur into the room and gave him the Issues List. Arthur left the room to read it. When he returned, he was visibly agitated and angry.[135] A "tension-filled" discussion ensued.[136]

Recollections differ as to whether the items were presented as mandates or proposals for discussion. The stronger evidence establishes that the items were presented as proposals. Regardless, the Issues List was a "serious thing" and a "big deal."[137] The upshot was "we just can't keep going on the same way we're going" and

---

[133] Shea Dep. 342–43.

[134] Carleton Tr. 871–73.

[135] Hachigian Tr. 45–46; Collins Tr. 426–28; Shea Dep. 348.

[136] Collins Tr. 427–28; Hachigian Tr. 46.

[137] Hachigian Tr. 47; *accord* Carleton Tr. 910 ("quite serious").

that "these were areas . . . to try to build a bridge with the board."[138] A reasonable CEO would have recognized that the Board wanted changes and sought to engage constructively. The directors were entitled to expect that Arthur would act in good faith and endeavor to make progress.

Recollections also differ over whether the Board had raised the items on the Issues List previously. Regardless of whether the Board formally presented them, the evidence establishes that Collins and Hachigian had been raising concerns about information flow for years, and the sisters had been asking for greater transparency for a decade. The Governance Initiatives from August 2022 reflected similar items. But even if the directors had not formally raised them, they were serious, non-pretextual requests.

---

[138] Carleton Tr. 876; *see* JX 150 at 1 (Hachigian explaining that "the point of delivering the list to Arthur in writing . . . was to demonstrate the seriousness of this topic and to indicate that the Board expected substantive action"). To that end, the Issues List repeatedly used "should" and "will" to describe what the directors wanted to happen. JX 129 at 3 ("Budgets *should be presented* by quarter"; CapEx projects "*will be presented* for approval to the Board"; "Heads of key functional areas of the Company *will present* at Board meetings as directed by the Board"; the Board "*will be informed* by management in advance of any material activities, events or changes happening at the Company"; "[t]he next Board meeting *will take place* on Friday, November 1, 2024 at 10am at which the CEO . . . *will present* for discussion and approval . . . ." (emphasis added)); *see* Hachigian Tr. 46 (citing a reference to a meeting "to assess progress against the requirements on the list").

Both Hachigian and Carleton proposed revisions to the minutes of the executive session with each seeking to shade the language in favor of their personal recollections and perspectives. *See* JX 139; JX 150; JX 852; Carleton Tr. 900–15; *compare* JX 150 *and* JX 160 *with* JX 402 *and* JX 401. Neither effort was nefarious.

35

## O. The August 2024 Family Meeting

After the August 2024 Board meeting, Hachigian took the lead on setting up a meeting so that the sisters and their adult children could receive an update and ask questions.[139] The Issues List had grown out of the August 2024 alignment meeting, which in turn resulted from Glorianne's desire to enlist Shea and agree on a list of simple action items that could reduce tensions and avoid a full-blown family fight. It made sense to have a follow-up meeting so that the sisters and their adult children could hear where things stood. Hachigian asked Carleton to attend and to give Arthur a heads up so he was not surprised.[140]

The meeting took place on August 27, 2024, at Hachigian's office. Collins, Hachigian, Shea, Carleton, and some of the sisters' adult children attended.[141] Frances's son Teddie quickly raised "the list" and asked Hachigian, "[Y]ou gave him the ultimatum, right?"[142] Carleton told Teddie that "there were no ultimatums in that room," and Hachigian agreed.[143] Arthur argues that this comment shows that the August 2024 Board meeting was a setup, but it is understandable that the sisters'

---

[139] *See* JX 135 at 1; Collins Tr. 513.

[140] *See* JX 135 at 1.

[141] Collins Tr. 512–13; Carleton Tr. 880–81.

[142] Carleton Tr. 881–82; *accord* Shea Dep. 231–32. *See* Collins Tr. 513.

[143] Carleton Tr. 883.

children would have learned about the plan coming out of the August 2024 alignment meeting and could have interpreted the agreed-upon list as an ultimatum.

At some point during the meeting, Hachigian told the sisters' children, "it's your decision on who is going to manage this company and how it's going to be managed and whether it's Arthur, whether it's not Arthur. It's your decision."[144] Arthur argues that this comment shows that Hachigian was working for the sisters, but the comment reflected the corporate governance reality. With the sisters owning a hard majority of the voting power that eventually would pass to their heirs, the sisters' children would be able to determine the fate of the Company, even if that meant an ugly, extended, and destructive battle. Based on the reports she received from her children, Caren texted Frances that the meeting had demonstrated to Shea and Carleton that "the three families are Unified" and that there was "absolutely no support" for Arthur to transfer power to his children.[145]

## P. Arthur's Passive-Aggressive Resistance

During the months after the August 2024 Board meeting, Arthur failed to make any meaningful effort on the Issues List. Rather than being constructive, he hunkered down in a passive-aggressive stance.

---

[144] *Id.*; *accord* Shea Dep. 234.

[145] JX 851 at 110 ("[H]eard from my boys that all the boys were excellent. Made it clear to Bill and Terry that the three families are Unified, absolutely no support to Continue to transfer power to his own family.").

The first sign involved the No Celebration Issue. During the August 2024 Board meeting, Arthur knew he had a public relations team "working with the media" to "celebrate" the 2014 walkout and boycott, but he said nothing about it.[146] After the meeting, he did "absolutely" nothing to stop the public relations effort.[147] As a result, on August 27, 2024, a "massive" media campaign kicked off.[148] By allowing the publicity campaign to proceed, Arthur thumbed his nose at the Board over the No Celebration Issue. The publicity was likely good for the Company in terms of reinforcing brand loyalty,[149] but it heightened Hachigian's concerns that Arthur would fight back, including by reprising his brinksmanship strategy from 2014.[150]

Another sign involved the follow-up Board meeting that the Issues List contemplated holding on November 1, 2024. Citing scheduling conflicts, Batchelder proposed alternative dates. Hachigian and Collins agreed that the next Board meeting could take place on January 9, 2025, but that was a long way away.[151]

---

[146] Arthur Tr. 680–81.

[147] *Id*. at 679–80, 682.

[148] Hachigian Tr. 53–55; JX 136. Arthur claims it was too late by August 22 to stop the effort. *See* Arthur Tr. 614–15. That may be partially true, but Arthur made no effort. Not only that, but his public relations team and other allies sent a "statement in to the other reporter" *after* the initial *Boston Globe* piece. JX 137 at 1.

[149] *See* JX 850 at 7.

[150] *See* Hachigian Tr. 216–17 (testifying he "felt it was dangerous" to call attention to the 2014 events because he thought Arthur "would not be accepting of the list" and it was therefore "dangerous to be reminding the public of a boycott").

[151] *See* JX 842.

A more serious sign involved the CapEx Issue. On November 20, 2024, one of Arthur's lieutenants emailed the directors that the Company had purchased a new site in Scarborough, Maine, just minutes before the Company announced it publicly.[152] The directors wanted Arthur to consult with them before any commitments were made, and they asked that they not learn about store openings after the fact or in the press.[153] Arthur nominally gave the directors prior notice while thumbing his nose at the substance of the request.

## Q. The January 2025 Board Meeting

With the January 2025 Board meeting approaching, the sisters decided to demonstrate their seriousness. On January 3, they executed a stockholder written consent removing Carleton from the Board.[154]

Six days later, the directors met. Ignoring the Management Team Issue, Arthur did not bring any other members of management to the meeting. During the regular session, he reported on several current and projected future capital projects

---

[152] Keyes Tr. 333–36; Hachigian Tr. 57–58; JX 157; JX 506.

[153] Collins Tr. 435–38; Hachigian Tr. 58; Keyes Tr. 327–28, 332–33.

[154] PTO ¶ 64; JX 164. In substance, they viewed Carleton as Arthur's ally and had become more and more frustrated with him as time went on. *See* Hachigian Tr. 82; Caren Dep. 127–29; Glorianne Tr. 395–96; Frances Dep. 84.

and provided a high-level estimate for capital expenditures in 2025.[155] He did not provide a budget or more detailed CapEx projections.

The meeting then moved into executive session with Arthur present. As they went over the Issues List again, the discussion became heated.[156] Hachigian, Collins, and Keyes felt Arthur had made "no progress" since August 2024.[157] Arthur claims to have expressed a willingness to work with the Board on certain issues, but his overall message and behavior were not reassuring. According to his own notes, Arthur emphasized that Market Basket has only "1 Boss" (i.e., him).[158]

On the Budget Issue, Arthur questioned their usefulness and said preparing them was "not our customary practice."[159] He then suggested the Company's CFO could work with Collins to prepare a budget for 2025 if it was helpful.[160] Arthur approached the CapEx Issue similarly. He made clear that there had always been "one person" at the Company that made decisions on real estate, originally his

---

[155] JX 166 at 2 (reporting that capital spending "looks like $100-$125M for 2025, although if some of the potential sites work out, it could be higher"); *see* Hachigian Tr. 236–38.

[156] *See* JX 167; Collins Tr. 447–48; Batchelder Tr. 769.

[157] Hachigian Tr. 70–71; Collins Tr. 448.

[158] Arthur Tr. 706; JX 168 at 3.

[159] JX 168 at 1.

[160] JX 167 at 1.

grandfather, then his father, and "now it's me."[161] But he suggested he could live with a "Cap Ex budget which would likely be set forth as a range," as long as "[s]pecific projects inside the Cap Ex budget would not need additional board approval."[162] Although Arthur seemed to be cooperating on both issues, the reality proved different. After the meeting, the Company's CFO never reached out to Collins to address budgeting, and the CFO testified that when he raised the issue with Arthur and offered to move forward, Arthur said they "would discuss it further later."[163] They never did.

The directors had a lengthy and difficult discussion on the Succession Issue. Arthur repeatedly pounded the table,[164] and the personnel trying to deliver lunch kept scurrying out of the room.[165] Arthur reiterated that leadership should pass to his children Madeline and T.A., but acknowledged that "if there were no suitable family members, the Board should look inside the Company and only if there was no one suitable inside the Company, should the Board look outside the Company for a

---

161 Keyes Tr. 337–38; *see* JX 168 at 1; JX 169 at 7; Batchelder Tr. 797.

162 JX 167 at 1.

163 Mulligan Tr. 827; *see* Collins Tr. 450–51.

164 Hachigian Tr. 71–73; Collins Tr. 447. Arthur behaved similarly at a prior meeting. Caren gave detailed testimony about an earlier Board meeting at which Shea raised succession at her request. Arthur slammed his hands down and said, "[T]he best succession plan is no succession plan." Caren Tr. 281–83. Arthur's denial of the events was not credible. Arthur Tr. 581–82.

165 Collins Tr. 447–48.

successor."[166] Arthur also said "that the board would ultimately decide."[167] That sounded positive, but Hachigian, Collins, and Keyes were no longer taking Arthur's statements at face value and wanted to see concrete action.[168] Hachigian told Arthur that he needed to engage with the other stockholders on succession because "[t]he shareholders are free to make a decision even if it is a bad decision" and he was "only delaying the explosion."[169]

Arthur ultimately went around the room and asked each director if they would terminate him despite the Company's strong performance.[170] Hachigian and Collins said they would, depending on the circumstances.[171] Keyes said he "didn't know" and

---

[166] JX 190 at 7.

[167] Hachigian Tr. 186–87; *see* Arthur Tr. 582–83, 637.

[168] *See* Hachigian Tr. 72–73, 248–49; Collins Tr. 447–48, 517–18; *see also* Hachigian Dep. 90; Keyes Dep. 172–73.

[169] JX 169 at 7–8. Batchelder's draft minutes included Arthur's statement about openness to succession options. *See* JX 190 at 7. Hachigian agreed that Arthur made the comment but struck it from the draft minutes and replaced it with the statement, "Mr. Demoulas did not express a willingness to change his position." JX 202 at 4. He argued that Batchelder's draft "made it sound like [Arthur] was open to the idea" when "it was clear" that Arthur would only consider his children. *See* Hachigian Tr. 72–73, 246–49. Hachigian's change to the minutes was questionable. Corporate minutes should accurately reflect what transpired at the meeting, not the subjective views of particular directors about what another speaker meant. That edit, however, was a misstep. It does not support a finding that Hachigian acted in bad faith when first suspending and later terminating Arthur.

[170] Hachigian Tr. 87; Collins Tr. 451–52; Keyes Tr. 338–39.

[171] Hachigian Tr. 89; Collins Tr. 451–52; *see* Batchelder Tr. 798–99; JX 169 at 8.

he "might even resign."[172] Each viewed the question as a confrontational threat, as if Arthur was daring the directors to fire him.[173] Based on that question and the general tenor of the day, Collins concluded that "the boardroom had become dysfunctional."[174]

## R. Contingency Planning

After the January 2025 Board meeting, Hachigian, Collins, and Keyes doubted that meaningful progress with Arthur was possible. They faced the reality that they might need to terminate the Company's CEO. They prudently began contingency planning.

On January 17, 2025, Hachigian spoke with Stephen Bebis, "[a] very dear friend" of Caren whom she introduced to Hachigian "in case . . . they put [Arthur] on

---

[172] Keyes Tr. 338–39.

[173] Hachigian Tr. 89 (a "threat"); Collins Dep. 131–33 (a "dare"); Keyes Tr. 338–39 ("aggressive . . . escalat[ion]").

[174] Collins Tr. 451–52. Batchelder's draft minutes suggest that Hachigian, Collins, and Keyes had good cause to question her accounts. Batchelder omitted Arthur asking the directors if they would fire him, despite that exchange appearing in her notes. *Compare* JX 169 at 8 (notes) *with* JX 167 (minutes). Her draft also characterized Arthur as asking the directors if they saw "any negatives" in his performance and then reported that "there were none." JX 187 at 5. In reality, the directors were silent. Hachigian Tr. 84–87; Batchelder Tr. 765–66; JX 169 at 4; *see* JX 500.

leave."[175] Hachigian asked Bebis if he would consider serving as interim CEO if needed.[176] Hachigian had not discussed that specific step with the Board.[177]

Later in January, Hachigian and Collins met with a recently retired Company executive. They asked whether he thought there would be a boycott or a walkout "if anything happened to Arthur."[178] The former executive expressed doubt that either would happen.[179] Hachigian understood him to say that Arthur and his lieutenants might try, but they would not be successful.[180]

## S.    The March 2025 Board Meeting

The next Board meeting took place in March 2025. In advance, Collins asked Arthur to bring the "Head Merchant" to the meeting.[181] Hachigian reiterated the request by email.[182] Arthur telephoned Collins and "forceful[ly]" told him that he must not be paying attention, because Arthur was the "Head Merchant," and he came

---

[175] Caren Dep. 216–18; *see* JX 172 at 1; Hachigian Tr. 250–51.

[176] JX 172 at 1; Hachigian Tr. 251.

[177] Hachigian Tr. 251–52.

[178] Trainor Tr. 526–28.

[179] *Id*. at 528.

[180] Hachigian Tr. 264–65.

[181] JX 187 at 2; Collins Tr. 438–41.

[182] Hachigian Tr. 76–80; JX 192 at 1–2; JX 364 at 9.

to every meeting.[183] Hachigian then sent Arthur a list of four executives who he could bring to the meeting to present to the Board.[184] Arthur did not bring anyone.[185] His passive-aggressive obstruction was continuing.

During the meeting, Hachigian, Collins, and Keyes tried again to demonstrate their seriousness by replacing Shea with Hachigian as Chair.[186] Arthur was furious and went on a tirade. He accused Hachigian, Collins, and Keyes of "destroying the company" and called them "hostile," "incompetent," "classless," "disrespectful," and "walk-ons" before abruptly leaving.[187]

Hachigian, Collins, and Keyes left the March 2025 Board meeting believing that Arthur was intractable. Hachigian concluded that there was "little chance" that

---

[183] Collins Tr. 440–41.

[184] JX 192 at 1.

[185] *See* Arthur Tr. 637–39, 672–73.

[186] JX 195; Hachigian Tr. 91; Collins Tr. 519–20. The sisters did not know in advance about Shea's replacement. *See* Glorianne Dep. 303–04; Frances Dep. 138; Caren Dep. 234–36. Hachigian approached Shea before the meeting. He told Shea that he knew Arthur was pressuring him and that his health was bad (both were true), and he suggested that Shea could step down. Hachigian Tr. 90–91. Shea "understood and thought it made sense." *Id.*; *accord* Collins Tr. 452–54; Caren Tr. 293; Glorianne Tr. 398–401, 403; Glorianne Dep. 304–05, 312; Shea Dep. 224. During the meeting, however, Shea did not voluntarily step down. Collins, Hachigian, and Keyes voted to replace him; Shea abstained. PTO ¶ 66.

[187] Arthur Dep. 341–44; Hachigian Dep. 301; Hachigian Tr. 93–94; Collins Tr. 454–55; Keyes Tr. 339–41; *see* JX 195; JX 196. Arthur's display was so extreme that Caren wrote a note to the three directors apologizing for his behavior. Caren Dep. 309–12; JX 198.

45

Arthur would change his behavior.[188] Keyes believed that he would be failing to fulfill his own fiduciary responsibilities if Arthur remained in place.[189] Arthur never made any concrete progress on the items on the Issues List.[190]

## T.     Apparent Preparations For A Walkout

In April 2025, Collins and Hachigian learned from Michael, Frances' son and the long-time Head of Deli, Seafood and Prepared Foods, that Arthur's lieutenants "were pressuring store managers and other associates . . . that if anything should happen to Mr. Demoulas, [then] individuals should be prepared to choose sides."[191] Hachigian called a recently retired executive who reported that "he had heard the same."[192]

Hachigian, Collins, and Keyes were keenly aware that the 2014 walkout had nearly forced Markets into bankruptcy.[193] They rationally feared that Arthur felt cornered and would run the same play in 2025.[194] Each testified credibly to believing

---

[188] Hachigian Tr. 113–15.

[189] Keyes Tr. 342–43.

[190] *See* Arthur Tr. 669–73, 676–77; Mulligan Tr. 827–30; Shea Dep. 332, 337–38, 354–56; Carleton Tr. 916–17; Batchelder Tr. 796–800.

[191] Hachigian Tr. 98–99; *accord* Collins Tr. 456–58. Michael did not mention the source of the reports. Hachigian Tr. 260–61.

[192] Hachigian Tr. 105–07; *see* Trainor Tr. 533.

[193] *See* Hachigian Tr. 48–53; Keyes Tr. 317, 341–43; Collins Tr. 410–11, 458.

[194] *See* Hachigian Tr. 48–52, 147–50; Collins Tr. 458–60; Keyes Tr. 342–43.

that Arthur was behind the 2014 walkout and that he would try it again.[195] As Keyes explained, they felt they needed a "zero tolerance policy" given the risks.[196]

Against that backdrop of suspicion, Arthur caused the Company to pay a cumulative $15 million bonus to its employees in recognition of the events of 2014 and to thank them for their support, without informing or seeking approval from the Board.[197] Hachigian, Collins, and Keyes rationally believed that Arthur was trying to ensure the employees would be on his side when the fight came.[198]

---

[195] Hachigian Tr. 48–52, 147–50; Collins Tr. 458–60; Keyes Tr. 342–43; *see* JX 502. Hachigian conceded that he had no way of judging the credibility of the reports he received and did not seek to verify them. Hachigian Tr. 106–07, 260–61. Arthur faults the directors for acting on hearsay. He also argues that Michael sought to advance his own position in the Company by claiming there was a walkout scheme. The directors rationally decided to trust Michael, the former executive, and the two separate, unconnected reports they received.

[196] Keyes Tr. 342–43.

[197] Hachigian Tr. 55–56; Arthur Tr. 682–83.

[198] At trial, Arthur claimed that he was not aware of any calls or conversations about a walkout and that he never asked his lieutenants to take any action or communicated with them about it. Arthur Tr. 641, 645. That testimony lacked credibility and reflected Arthur's efforts at plausible deniability. Other witnesses testified credibly that Arthur's lieutenants would not have acted without his knowledge and approval. *See* Hachigian Tr. 143; Keyes Tr. 336–37; Collins Tr. 466–75. And even if Arthur did not specifically ask them to act, they were loyal lieutenants who sought to advance Arthur's interests, and Arthur did nothing to stop them. *See, e.g.*, Arthur Tr. 697. As in 2014, Arthur did not have to ask.

## U.  The Suspension, The Investigation, And The Executive Committee

After learning about the employee bonus, Hachigian, Collins, and Keyes took action.[199] First, they engaged Quinn Emanuel Urquhart & Sullivan, LLP as counsel for themselves and the Company "in connection with various governance and fiduciary duty issues that may arise with Arthur T. Demoulas."[200] They did not involve Shea out of well-justified concern that he would tell Arthur.[201]

Through Quinn Emanuel, they engaged three public relations firms to prepare for a media campaign.[202] They also began reviewing and commenting on draft suspension letters, press statements, and other materials with Quinn Emanuel and the public relations firms.[203]

Next, they formed an executive committee (the "Executive Committee"). At that point, the three directors "had very little confidence" that Shea would keep information confidential from Arthur, and they concluded that they needed to be able to act without Shea's involvement.[204] During a telephonic meeting of the Board on

---

[199] *See* Hachigian Tr. 114.

[200] JX 216 at 1.

[201] JX 295 at 2–3; Hachigian Tr. 271. Arthur attacks the retention of Quinn Emanuel because the full Board did not approve it. But the Board later ratified the retention.

[202] Hachigian Tr. 272.

[203] JX 218 at 1; Hachigian Tr. 273.

[204] Hachigian Tr. 107; *accord* Collins Tr. 459.

May 16, 2025, they formed the Executive Committee and populated it with themselves.[205] Shea objected that the Executive Committee seemed "designed to keep information from him as a director and from Mr. A.T. Demoulas."[206] Hachigian viewed that objection as "an admission that [Shea] would share" information with Arthur.[207] The resolutions forming the Executive Committee gave it the full powers and authority of the Board.[208]

The Executive Committee met for the first time on March 27, 2025. The members voted unanimously to suspend Arthur with pay pending an investigation conducted by Quinn Emanuel. Believing that Arthur was working through his allies, they suspended his lieutenants, children, and brother-in-law with pay. They also ratified the engagement of Quinn Emanuel and the public relations firms and retained Richards, Layton & Finger, P.A.[209]

On May 28, 2025, Hachigian and Collins hand-delivered letters to Arthur and his allies that notified them of their suspensions. During the resulting discussion with Arthur, he "agreed that none of those items [on the Issues List] were complied

---

[205] PTO ¶ 68.

[206] JX 222 at 2.

[207] Hachigian Tr. 109–10.

[208] PTO ¶ 69; *see* JX 222 at 2.

[209] JX 229.

49

with."[210] Later that day, the Company issued a press release, and Hachigian, Collins, and Keyes each spoke with the press.[211] They cited "credible allegations" that Arthur and the other suspended individuals were organizing a walkout.[212]

During a meeting of the full Board on May 30, 2025, Collins, Hachigian, and Keyes voted to ratify the Executive Committee's actions. Shea abstained.[213]

## V. The Investigation, Media Campaign, And Trespassing

After Arthur's suspension, Quinn Emanuel conducted an investigation. William D. Weinreb, a former Acting U.S. Attorney for the District of Massachusetts, and Stephen E. Frank, a former Assistant U.S. Attorney in the U.S. Attorney's Offices for the District of Massachusetts and the Eastern District of New York, led the investigation.

Meanwhile, Arthur struck back with a public relations campaign of his own. His spokesperson Justine Griffin attacked the Board and his sisters. She made multiple statements to the press and described Arthur's firing as a "hostile

---

[210] Hachigian Tr. 120–21.

[211] *Id.* at 275–76.

[212] *Id.* at 276.

[213] During Arthur's suspension, a group of executives, including Michael, stepped up to run the business. JX 310; Trainor Tr. 530; Quigley Dep. 20–21; Hachigian Tr. 262–63. Arthur emphasizes Michael's role, but no single individual took charge. Trainor Tr. 530; Quigley Dep. 20–21; Hachigian Tr. 262–63. Though others were promoted (JX 283), Michael did not receive a promotion or additional compensation, and the directors decided that no one from the next Demoulas generation would be considered as Arthur's successor. Hachigian Dep. 228–29; Collins Tr. 510–11; Carleton Tr. 872–73.

takeover."[214] Griffin's firm set up a website and social media account called "The Market Basket Way" to promote Arthur and oppose the Board.[215] Arthur's allies and children were directly involved in those efforts. The website posted personal contact information for the plaintiff directors and the sisters and encouraged the public to ask them to "Reinstate Arthur T. Demoulas and his team."[216] Other social media posts caricatured and mocked the directors and the sisters.[217] The resulting internet mob sent the directors and the sisters vitriolic messages and even death threats.[218] Arthur's lieutenants chipped in with an extended interview on a Boston news program that claimed the sisters had orchestrated Arthur's removal.[219] Arthur admitted that he hired Griffin, paid her, worked and spoke with her "about the PR campaign," followed the campaign, made no effort to stop anything she did, could not

---

[214] JX 234 at 2; *see* JX 266.

[215] *See* JX 505; JX 360.

[216] JX 505 at 13; *see* JX 255 at 1, 7.

[217] *See* JX 381 at 1–3 (cartoons ridiculing the plaintiff directors as clueless and greedy profiteers destroying Market Basket's culture); *id.* at 4 (cartoon ridiculing the sisters as the greedy "Non-working Market Basket Shareholders" with the caption "Three Blind Mice, corporate edition").

[218] Frances Dep. 148–49, 236–37; Caren Dep. 301–02; Keyes Tr. 343–44, 376; JX 269; JX 277 at 1.

[219] JX 268.

recall anything she did without his authorization, and was "happy with" her work on his behalf.[220]

On August 1, 2025, the *Boston Globe* published an op-ed by David D'Alessandro, former CEO of John Hancock Financial Services, titled *This is how the Market Basket family feud will end: Here's what consumers can do to help end the fighting*.[221] D'Alessandro portrayed the directors as outsiders destroying the Company.[222] He called on customers to "boycott Market Basket."[223]

Hachigian, Collins, and Keyes believed that Griffin worked with D'Alessandro on the op-ed as part of Arthur's strategy,[224] and there is some evidence to support that.[225] Regardless, Griffin posted the article on The Market Basket Way social media account, featured many quotations from the article, and repeated D'Alessandro's call

---

[220] Arthur Tr. 657–59; Arthur Dep. 253, 257–58, 263–64, 267–68, 281–82, 284, 288–89, 291.

[221] JX 293.

[222] *Id.* at 4–5.

[223] *Id.* at 5.

[224] Keyes Tr. 343–44; Hachigian Tr. 131–40.

[225] D'Alessandro testified that he shared a draft of the article with Griffin before publication for fact-checking purposes. D'Alessandro Tr. 380–81; Arthur Tr. 661–63. D'Alessandro claimed Griffin did not want him to call for a boycott. D'Alessandro Tr. 382, 385–86. D'Alessandro deleted his communications with Griffin. *Id.* at 381–83.

for a boycott.[226] Through his lieutenants, Arthur leaked confidential information about the Company and made false statements in an effort to provoke a public backlash.[227]

The directors also made their own statements to the press. For example, Keyes told a *Boston Herald* reporter that "Demoulas is reported to have said on an earlier occasion that if he can't be in charge, he'd rather burn it all down, referring to Market Basket."[228] Keyes admitted at trial that this statement was based on secondhand information and that he did not know from whom he heard it.[229]

Most significantly, two of Arthur's longtime lieutenants spent the spring and summer of 2025 visiting over twenty-five Company properties, including its

---

[226] JX 292; JX 382; JX 508; Arthur Tr. 660–63. Arthur himself testified he "liked this article." Arthur Tr. 660.

[227] *See* Collins Tr. 468–73; Keyes Tr. 343–44. For example, Batchelder sent confidential board materials to Crossen, including during the parties' mediation on September 3, 2025, and conducted an interview with the *Boston Globe* about Board proceedings. Batchelder Tr. 790–96; JX 345; JX 511; JX 512; JX 285. Shea also spoke to the *Boston Globe* on Arthur's behalf. *See* Collins Tr. 468–73; JX 257; JX 266; JX 324 at 2; Shea Dep. 408, 412; JX 256; JX 253; JX 254. At trial, when confronted with an email from Crossen addressed to "Artie" forwarding Shea's statement and Griffin's public relations plan, Arthur claimed not to know anything about it. Arthur Tr. 717–20; JX 324. He claimed emails addressed to him at the email address "dmb1917@aol.com" (named for the year "Demoulas Market Basket" was opened) were sent to his wife and not to him. Arthur Tr. 717–21; JX 324; JX 336. That was not credible.

[228] JX 366 at 4; Keyes Tr. 373–74.

[229] Keyes Tr. 374–76. Arthur attacks Keyes for not verifying this statement and Keyes admitted he "could have made a call," but he thought "[Arthur's] actions kind of, by and large, backed up that statement." *Id.* at 376. That was a rational assessment.

headquarters, to pressure employees to support Arthur.[230] Both had been suspended and prohibited from communicating with employees or entering Company property.[231] They waived tauntingly at security cameras.[232] Arthur knew about their activities but did not stop them.[233] Instead, he praised them in the press as "men of integrity and honor" and paid Griffin to represent them.[234] When the Company obtained an injunction against them in court, Griffin was right there behind them.[235]

On August 7, 2025, the sisters removed Shea from the Board.[236] His removal left Hachigian, Collins, and Keyes as its only members (the "Current Directors").

---

[230] Keyes Tr. 343–44; Collins Tr. 470, 474–75; Hachigian Tr. 141–42.

[231] JX 232; JX 238; JX 260; JX 261.

[232] JX 306; *see also* JX 301–JX 305.

[233] Arthur Tr. 696–97. Shortly after their suspensions, Arthur and the two lieutenants obtained temporary phones to communicate. Arthur Tr. 686–88, 690–91, 693–95; Quigley Dep. 33–34; JX 385; JX 368; JX 380. Arthur originally concealed his use of the phones in this litigation, disclosing only his personal cell phone in interrogatory responses. Arthur Tr. 691–94; JX 364 at 10–11; JX 371 at 2; JX 373 at 12. The plaintiffs moved successfully to compel their production. *See* Dkt. 74; Dkt. 92. Arthur testified that his temporary phones somehow fell "off [his] radar screen," despite having "[n]ever" used temporary phones in the past. Arthur Tr. 691–94; *see* JX 373 at 12. That testimony was not credible. Arthur admitted to talking with his lieutenants and others during their suspensions using his temporary phones. Arthur Dep. 61–62, 64–74; *accord* JX 368. One of Arthur's other loyalists also testified that he spoke to his two principal lieutenants on their temporary phones. Quigley Dep. 33–39; *accord* JX 368.

[234] Arthur Tr. 697, 700–01; JX 503 at 2; Collins Tr. 470–73.

[235] *See* Hachigian Tr. 143–45; JX 323 at 1.

[236] PTO ¶ 67; Caren Tr. 310–11; Frances Dep. 183, 233–34.

## W. The Investigation Concludes.

On September 2, 2025, Quinn Emanuel issued a thirty-six-page investigative report. It contains findings based on interviews with directors and twenty-four current and former employees at all levels of the Company and across departments, including Arthur. The investigation concluded that Arthur was "not . . . credible"; had "refused to take basic steps to comply with reasonable Board requests"; "that his relationship with the Board ha[d] broken down irretrievably"; and that he had "condoned, and more likely orchestrated, a plan to bring Market Basket to its knees through a 2014-style employee walkout, work slowdown, and customer boycott in the event of his termination."[237] Multiple associates confirmed that Arthur's lieutenants had encouraged a walkout and would never have done so without Arthur's blessing.[238] During his interview, when asked to condemn a boycott, Arthur refused.[239]

Arthur and his attorneys never disputed the report's conclusions.[240] Hachigian believed that the report "confirmed the matters [the Board] was worried about" before it suspended Arthur, and that the Board "had done the right thing in cutting this off as soon as [they] did" to protect the Company.[241]

---

[237] JX 342 at 12, 34.

[238] *Id.* at 12, 14–18.

[239] *Id.* at 18; *see* Arthur Tr. 667.

[240] Arthur Tr. 668.

[241] Hachigian Tr. 126.

## X. The Unsuccessful Mediation And Arthur's Termination

In September 2025, the parties mediated unsuccessfully with former Vice Chancellor Joseph R. Slights III. After the mediation failed, the Board met by Zoom on September 9. Arthur was invited to attend but did not. The Current Directors voted unanimously to terminate Arthur as President and CEO, without cause, effective immediately. The Current Directors filed this action to confirm the validity of their actions.

In terminating Arthur, the Current Directors relied on his pre- and post-suspension conduct.[242] They concluded that Arthur would not change his behavior and that with Arthur as CEO, the boardroom environment was untenable.[243] Keyes testified that by refusing to make any effort to cooperate, "Arthur fired himself."[244]

Arthur insists that the Current Directors fired him at his sisters' behest. But the record shows his narrative to be oversimplified and mistaken. Each of the sisters sought to avoid having matters come to a head and testified to finding Arthur's termination "sad," "somber," "jarring," and not where they wanted to end up.[245] Frances has always been the most adversarial toward Arthur. She texted Hachigian:

---

[242] Collins Tr. 466–75, 477–79; Keyes Tr. 343–44, 346–47; Hachigian Tr. 131, 143, 148–50; *see* JX 277.

[243] Collins Tr. 478–79; Hachigian Tr. 148–50; Keyes Tr. 346–47.

[244] Keyes Tr. 346.

[245] Caren Tr. 311–12; Glorianne Tr. 407; Frances Dep. 238–39.

"Remember secretariat not only won the triple crown but won the Belmont stakes by 30 lengths. Thank you for going the distance with us."[246]

## Y. Market Basket's Performance Since Arthur's Termination

After terminating Arthur, the Board appointed the Company's CFO as Interim CEO. With him at the helm, the Board receives timely access to information and management. Since Arthur's departure, the Company is performing well.

## II. LEGAL ANALYSIS

Professor Adolf Berle famously stated that,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[247]

Delaware follows the twice-tested principle.[248]

The Current Directors brought this action under Section 225(a) of the Delaware General Corporation Law (the "DGCL")[249] to confirm that they properly terminated Arthur. They sued in their capacities as directors, and they caused the Company and Markets to seek the same relief. Their complaint focused on

---

[246] JX 390 at 9.

[247] Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[248] *CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 397, 400 (Del. 2023); *In re Invs. Bancorp, Inc. S'holders Litig.*, 177 A.3d 1208, 1222–23 (Del. 2017).

[249] 8 *Del. C.* § 225.

demonstrating that they complied with the technical legal requirements for valid action. The Company's bylaws permit the Board to terminate the CEO without cause, and the Current Directors argued that they took action by the requisite majority at a duly called meeting where a quorum was present. In other words, they presented Berle I issues.

Arthur responded with affirmative defenses and a counterclaim. He contended that even if the Current Directors complied with the technical legal requirements, they breached their fiduciary duties. At trial, he sought to prove that the Current Directors acted in bad faith by serving the interests of his sisters and their families, rather than pursuing the best interests of the Company. He maintains that the Current Directors manufactured pretextual grounds for his termination so that the sisters could win a family feud and the Current Directors could maintain their directorships. In other words, he presented Berle II issues.

"A Section 225 proceeding is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer."[250] By its terms, the statute focuses on "validity"—principally a Berle I concept—and states:

> Upon application of any stockholder or director, or any officer whose title to office is contested, the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office, and, in case any such office is claimed by more than 1 person, may determine the person entitled thereto; and to that end make such order or decree in any such case as may be just and

---

[250] *Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011).

proper, with power to enforce the production of any books, papers and records of the corporation relating to the issue.[251]

But when presiding over a Section 225 action, the Court of Chancery can resolve other issues that "would help the court decide the proper composition of the corporation's board or management team."[252] The test is "whether it is necessary to decide [the issue] in order to determine the validity of the election or designation by which the defendant claims to hold office."[253] The nature of the claim or defense is not the determining factor.[254] If Berle II issues are determinative, then the court can address them.[255]

By the time of trial, Arthur's Berle II issues were the only matters in dispute. Having raised those issues as affirmative defenses and a counterclaim, Arthur bore the burden of proof.[256]

---

[251] 8 *Del. C.* § 225(a).

[252] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999), *aff'd as modified,* 737 A.2d 530 (Del. 1999) (TABLE).

[253] *Kahn Bros. & Co., Inc. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov. 15, 1988) (Allen, C.).

[254] *Agranoff*, 1999 WL 219650, at *18.

[255] *E.g.*, *Johnston v. Pedersen*, 28 A.3d 1079, 1092 (Del. Ch. 2011); *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *4 (Del. Ch. Sept. 21, 2011).

[256] *See Ryan v. Sea Colony Recreational Ass'n, Inc.*, 345 A.3d 960, 965 (Del. 2025) (affirmative defense); *Gammel v. Candler-Hill Corp.*, 103 A.2d 228, 233 (Del. 1954) (counterclaim).

## A. Arthur's Assertion That The Current Directors Acted In Bad Faith

Arthur sought to prove at trial that the Current Directors acted in bad faith. He failed to carry his burden.

By contending that the Current Directors acted in bad faith, Arthur asserts that they breached their fiduciary duties. A breach of fiduciary duty has only two elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[257]

In this case, the existence of a fiduciary duty is easy. The Current Directors are fiduciaries in their capacities as members of the Board. For over two centuries, American courts have treated corporate directors as fiduciaries who owe duties of loyalty and care to the corporation and its stockholders as a whole.[258]

---

[257] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002) (TABLE)).

[258] The seminal American decision is *Attorney General v. Utica Insurance Co.*, 2 Johns Ch. 371 (N.Y. Ch. 1817), an opinion by Chancellor James Kent, the renowned Chancellor of New York and author of *Commentaries on American Law* (1826–30). The first Delaware decisions appear some seventy years later. *See Walker's Adm'x v. Farmers' Bank*, 14 A. 819, 831 (Del. 1888); *Diamond State Iron Co. v. Todd*, 14 A. 27, 30 (Del. Ch. 1888), *aff'd*, 13 Del. (8 Houst.) 372 (Del. Jan. 16, 1889). Chancellor Charles M. Curtis, who served from 1909 to 1921, provided Delaware's first meaningful consideration of the duties of corporate fiduciaries in decisions like *Martin v. D.B. Martin Co.*, 88 A. 612 (Del. Ch. 1913), and *Cahall v. Lofland*, 114 A. 224 (Del. Ch. 1921), *aff'd*, 118 A. 1 (Del. 1922). Chancellor Josiah O. Wolcott, his successor who served from 1921 until 1938, issued several decisions addressing the role of directors as fiduciaries for the stockholders. *See, e.g., Harden v. E. States Pub. Serv. Co.*, 122 A. 705 (Del. Ch. 1923); *Roberts v. Kennedy*, 116 A. 253 (Del. Ch. 1922).

60

The element of breach is more nuanced. When evaluating breach, a court examines the fiduciary's conduct using a standard of review.[259] The standard of review is always more forgiving toward the fiduciary than the standard of conduct.[260] "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[261]

The business judgment rule is Delaware's default standard of review. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in

---

[259] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*].

[260] *Chen*, 87 A.3d at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra*, at 1296, and *Realigning the Standard*, *supra*, at 451–58; *accord* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421–28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v. Eisner*, 746 A.2d 244, 255–56 (Del. 2000) and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

[261] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

the best interests of the company."[262] Unless a plaintiff rebuts one of those elements, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[263] The business judgment rule thus provides "something as close to non-review as our law contemplates."[264] The rule "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[265]

Enhanced scrutiny is Delaware's intermediate standard of review.[266] It applies to specific, recurring, and readily identifiable situations marked by two features.

---

[262] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part by Brehm*, 746 A.2d at 253–54, *and in other part by United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1059 (Del. 2021). The partial overrules are as follows. In *Brehm*, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. 746 A.2d at 253 n.13. The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. More recently, the Delaware Supreme Court overruled *Aronson* and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), to the extent that they set out alternative tests for demand futility. *Zuckerberg II*, 262 A.3d at 1059. In their place, the high court adopted a single, unified test for demand futility. *Id.* This decision does not rely on *Aronson* for the standard of appellate review or for the test for demand futility, so the partial overrulings are not pertinent.

[263] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[264] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013).

[265] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

[266] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

First, there is a distinct context where the situational realities can subtly undermine the decisions of even independent and disinterested directors.[267] Second, the decision under review involves the directors intruding into a space where stockholders possess rights of their own.[268] The directors' exercise of corporate power therefore raises

[267] *Trados II*, 73 A.3d at 43.

[268] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 458–59 (Del. Ch. 2023) (examining enhanced scrutiny precedents and demonstrating how they fit this pattern), *aff'd in pertinent part, rev'd on other grounds*, 342 A.3d 324 (Del. 2025).

The second criterion—areas where stockholders have rights of their own—explains why enhanced scrutiny does not apply to CEO compensation, even though the situational dynamics surrounding those decisions might otherwise raise sufficient concerns. *See* Jae Yoon, *Corporate Waste Crossing The Rubicon: The Case For Executive Compensation Award Enhanced Scrutiny Applied Review*, 7 Corp. & Bus. L.J. 149, 188–89 (2026) (arguing that CEO compensation presents a recurring scenario involving situational pressures that can undermine the decisions of even disinterested and independent directors); *see also* Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 2, 37–39 (2006) (describing informational disparities that outside directors confront when making compensation decisions); Lisa M. Fairfax, *Sue on Pay: Say on Pay's Impact on Directors' Fiduciary Duties*, 55 Ariz. L. Rev. 1, 17 (2013) (describing the dominant academic framework for understanding executive compensation, which recognizes that "directors are too often at an informational disadvantage when assessing and approving compensation packages," and "[a]s a result, they defer to executives or other corporation managers who may have more expertise and experience"); Michael B. Dorff, *Does One Hand Wash the Other? Testing the Managerial Power and Optimal Contracting Theories of Executive Compensation*, 30 J. Corp. L. 255, 261, 266–67 (2005) (describing the "Managerial Power Hypothesis" as including the claim that "directors who wish to question management, despite [other] contrary incentives, have limited resources with which to do so" and finding that the results of the article's analysis "strongly support the Managerial Power Hypothesis, that the existence of managerial power over directors erodes directors' ability to restrain managers from pursuing their own interests at the corporation's expense"); Lucian Arye Bebchuk, Jesse M. Fried & David I. Walker, *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. Chi. L. Rev. 751, 766 (2002) (discussing problems that independent directors face when overseeing insiders' compensation

questions about the allocation of authority within the entity and, from a theoretical perspective, implicates the principal-agent problem.[269] The resulting scenarios call for an intermediate standard of review that examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[270]

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[271] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire

---

and performance, including that "even if directors were otherwise inclined to challenge managers on the issue of executive compensation, they would likely have neither the financial incentive nor sufficient information to do so"); *id.* at 772 ("[E]ven if directors have the inclination and incentive to negotiate for CEO compensation that maximizes shareholder value, they will usually lack the information to do so effectively. The CEO, by way of his personnel department, controls much of the information that reaches the committee.").

[269] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio*, 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[270] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

[271] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

64

fairness."[272] "Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[273]

This case does not involve any of the recurring scenarios that implicate enhanced scrutiny. The business judgment rule therefore presumptively applies. When the Board terminated Arthur, its only members were the Current Directors. To change the standard of review to entire fairness, Arthur had to prove that at least two of the Current Directors were not independent and disinterested, failed to exercise due care, or acted in bad faith.[274]

Arthur contends that the operative decision was not his termination, but his suspension. He says that after his suspension, he had no choice but to fight back to protect his reputation. But the actions he took when fighting back gave the Board ample cause to terminate him, so in a *Terminator* argument,[275] Arthur seeks to go back in time to challenge the earlier suspension decision. He maintains that by showing his suspension was inequitable, his termination becomes inequitable as well.

---

[272] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[273] *Id.*

[274] *See Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application").

[275] *See Glob. Cap. P'rs LLC v. Green Sapphire Hldgs., Inc.*, — A.3d —, —, 2026 WL 709819, at *26 n.253 (Del. Ch. Mar. 13, 2026) ("This is a *Terminator* argument. Just as Skynet sought to negate John Connor's imminent victory by sending the Terminator back in time to assassinate his mother and prevent John's birth, so too the Borrower seeks to negate the Settlement Agreement by reaching back in time to invalidate the Loan. *See The Terminator* (Hemdale Film Corporation 1984).").

Because Arthur's position fails even under that favorable construct, this decision assumes that the analysis should focus on Arthur's suspension.

When the Executive Committee suspended Arthur, its members were the Current Directors. Once again, Arthur must prove that at least two failed to exercise due care, acted in bad faith, or were not independent and disinterested, causing the standard of review to elevate to entire fairness. The Current Directors did not try to prove that the suspension was entirely fair, so Arthur would prevail.

## 1. The Concept Of Bad Faith As Pertinent To This Case

The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty."[276] To act in good faith, a director must subjectively believe that the chosen course of action serves the best interests of the corporation and its stockholders.[277] Stated conversely, a director acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[278]

---

[276] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (cleaned up).

[277] *See United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 895 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[278] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 755 (Del. Ch. 2005)); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney II*, 906 A.2d at 67)); *see Gagliardi*, 683 A.2d at 1051 n.2 (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989)

66

"It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[279] Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[280] A director can also act in bad faith by engaging in an "intentional dereliction of duty" such as through a "conscious disregard for one's responsibilities."[281]

Importantly for this case, fiduciary duties run "to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups."[282] A director can therefore act in bad faith by subjectively

(Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[279] *Disney I*, 907 A.2d at 754.

[280] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[281] *Disney II*, 906 A.2d at 66; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[282] *Gilbert v. El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990); *see McRitchie v. Zuckerberg*, 315 A.3d 518, 550 (Del. Ch. 2024) (discussing director duties toward stockholder collective versus duties toward individual stockholders); *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("[C]orporate directors do not owe fiduciary duties to individual stockholders; they owe fiduciary duties to the entity and to the

67

seeking to advance the parochial interests of specific stockholders at the expense of the corporation and its stockholders as a whole.

Bad faith is a state of mind, and "[t]he state of a man's mind is as much a fact as the state of his digestion."[283] As mortals, the members of the Court of Chancery "cannot peer into the hearts and souls of directors to determine their subjective intent with certainty."[284] "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts."[285] "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications."[286] "Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[287]

---

stockholders as a whole."); J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 49 (2015) ("The reference [to fiduciary duties running] to 'stockholders' means all of the corporation's stockholders as a collective. It means the stockholders as a whole . . . ." (footnote omitted)).

[283] *Edgington v. Fitzmaurice* (1885) 29 Ch D 459 at 483 (Eng.). For Bluebook afficionados, the reporter during this period is cited without punctuation. *The Bluebook: A Uniform System of Citation* tbl. T2.46 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025).

[284] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013) (internal quotation marks omitted).

[285] *Id.*

[286] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

[287] *Id.*

Lawyers routinely object to a witness speculating about another person's state of mind, but there is nothing special about it.[288]

> While "mind reading" might sound like a mentalist magic trick, for cognitive scientists it refers to the very pedestrian capacity we all have for figuring out what another human being is thinking. . . . Other people's minds are opaque to us, so we cannot observe them directly. And yet, when someone walks toward the water fountain on a hot day, we know she wants a drink. When someone yelps after stubbing her toe, we know she feels pain. When someone aims an arrow at a target, we know she intends to hit it. We take in observable data about a person and infer something about her unobservable mental life.[289]

"To get at a person's unobservable mental state, we look at what the person did and the circumstances in which they did it."[290]

Proving bad faith does not require a smoking gun. "Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available."[291] To detect a breach of fiduciary duty, a court may need to "look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable."[292]

---

[288] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1164 (Del. Ch. 2024).

[289] Mihailis E. Diamantis, *How to Read a Corporation's Mind, in The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023).

[290] *Found. Bldg.*, 318 A.3d at 1164.

[291] *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del. Ch. Aug. 8, 1988).

[292] *Id.*

## 2. Arthur's Claim That The Current Directors Were Loyal To The Sisters Rather Than The Company

According to Arthur, the Current Directors acted in bad faith by striving to benefit the sisters and their families, even if the Company suffered harm as a result. Despite incidents that a suspicious mind might seize upon and evidentiary snippets that skilled counsel might stitch together, the trial record demonstrates that the Current Directors subjectively believed that the actions they took were in the best interests of the Company and its stockholders. Only time will tell whether their decisions turn out well, and we will never know if another path might have been better, but they did not act in bad faith.

For starters, the Current Directors did not join the Board as a unified block or with a singular agenda. They joined over an approximately five-year period as both the sisters and the Current Directors sought unsuccessfully to work with Arthur.

Equally important, the Current Directors never acted hastily. Adding Keyes to the Board created an independent three-member majority in October 2023, but Hachigian and Collins did not sit down and take stock until April 2024, after Keyes had experienced Arthur's dictatorial style for himself. Working with Glorianne and her counsel, Hachigian met with Shea in August 2024 to get alignment on a list of simple action items for Arthur that would build trust and reduce tension. The Board presented the resulting Issues List to Arthur during the August 2024 Board meeting.

Arthur did not respond constructively to the Issues List. Rather than working with the Board, he took a passive-aggressive stance. He openly flouted the Board's request on the Management Team Issue. During the January 2025 Board meeting,

70

he made some positive noises on the Budget Issue and CapEx Issue, but nothing ever happened. A heated discussion took place on the Succession Issue, and although Arthur made some positive noises there as well, he ended the meeting by effectively daring the directors to fire him. The Current Directors left the meeting doubting that Arthur could change.

During March 2025, matters came to a head. Pursuing the Management Team Issue, Collins asked Arthur to bring the "Head Merchant" to the meeting, and Hachigian reiterated the request by email. Arthur then telephoned Collins and disrespectfully told him that he must not be paying attention, because Arthur was the "Head Merchant." Hachigian then sent Arthur a list of four executives he could bring to the meeting, but Arthur did not bring anyone. During the meeting, Hachigian, Collins, and Keyes tried to demonstrate their seriousness yet again by replacing Shea with Hachigian as Chair. Arthur went on an angry tirade. The Current Directors left the March 2025 Board meeting believing that Arthur was intractable, felt cornered, and could gamble on the same type of walkout and boycott strategy he had used successfully in 2014.

In that environment of suspicion, two events prompted the Current Directors to act. They heard rumors from two sources that Arthur's allies were preparing for a walkout, and they learned that Arthur sent out bonuses to employees as a thank you for their support in 2014.

At that point, the Current Directors decided that they needed to suspend Arthur pending an investigation. In taking that step, the Current Directors acted in

good faith and made a protected business judgment. They acted rationally to protect the Company. Arthur's suspension passes muster as a matter of equity.

### 3. Arthur's Evidence Of Loyalty To The Sisters

As evidence that the Current Directors were loyal to the sisters rather than the Company, Arthur cites a handful of isolated instances and contends that when taken together, they demonstrate bad faith intent. They do not.

Arthur first cites a text that Caren sent to Frances after Keyes joined the Board to the effect that "we're no longer playing defense."[293] That text does not suggest the Current Directors were engaged in a plan to fire Arthur to benefit the sisters. The sisters had spent a decade trying to convince Arthur to be more transparent and inclusive, and they had concluded through hard-won experience that Arthur would not change as long as his allies held at least a blocking position on the Board. With Keyes, there was an independent Board majority that could take action. Caren's message reflects her hope that matters would finally improve.

Arthur next cites the Current Directors' efforts to change how the Company referred to non-tax distributions, claiming it shows that they sought to help the sisters and their children in litigation over the Family Trust. Hachigian raised the issue because referring to the distributions as "extraordinary" favored Arthur's position in the trust litigation. From that baseline, any change in terminology would

---

[293] JX 851 at 51.

72

technically benefit the other members of the family. But Hachigian merely wanted a neutral term. That issue does not evidence loyalty to the sisters.

Arthur also complains that Hachigian and Collins suggested he step down as trustee of the Family Trust. That took place in May 2023, approximately one year after Arthur had declared that either his daughter or son would succeed him. Hachigian and Collins knew that succession was a hot-button issue, and they developed the Governance Initiatives in August 2022 and spent the following months trying to move forward on them. By May 2023, tensions were running high, so Hachigian and Collins met with Arthur. As part of that meeting, Hachigian suggested that it could reduce tensions if Arthur stepped down as trustee. That was a constructive proposal, made in good faith, and it should have been an easy give. Instead, Arthur sent hostile letters to Hachigian and Collins, copying all of the stockholders. Given a chance to reduce the temperature, Arthur cranked up the furnace.

Arthur also contends that Collins revealed his personal loyalty to the sisters in his April 2024 "report card" email to Hachigian and Kirby, where he gave Arthur an "A" on operations, a "B" on distributions, and a "D" on his "[s]tewardship of the family; inclusiveness; positivity; succession; [the Family T]rust; communication."[294] Arthur contends that those issues were outside of the Board's purview, but that is not so. Even in a public company, directors are properly concerned with stockholder-level

---

[294] JX 111 at 1.

issues.[295] Directors are also properly concerned with CEO succession.[296] "Often it is said that a board's most important task is to hire, monitor, and fire the CEO."[297]

For the Company, family issues were stockholder issues, because the four siblings and the Family Trust owned 100% of the Company's stock.[298] CEO succession was perhaps the most critical stockholder issue, because the sisters felt that Arthur had been excluding them from the Company, and they would not accept management passing to his children. If the Board did not engage on succession, then a damaging

---

[295] *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) ("[T]he board's power to act derives from its fundamental duty and obligation to protect the corporate enterprise, which includes stockholders, from harm reasonably perceived, irrespective of its source.").

[296] *Gorman v. Salamone*, 2015 WL 4719681, at *5 (Del. Ch. July 31, 2015) ("A primary way by which a corporate board manages a company is by exercising its independently informed judgment regarding who should conduct the company's daily business.").

[297] *Klaassen*, 2013 WL 5967028, at *15. *See, e.g.*, Douglas G. Baird & Robert K. Rasmussen, *The Prime Directive*, 75 U. Cin. L. Rev. 921, 923 (2007) ("[T]he challenge of hiring and firing managers is the single most important job that directors face."); Ira M. Millstein, *The Evolution of the Certifying Board*, 48 Bus. Law. 1485, 1494 (1993) ("[O]ne of the board's most important functions is to evaluate the performance of the CEO, and to replace an underperformer in a timely fashion."); *see also* Melvin Aron Eisenberg, *Legal Models of Management Structure in the Modern Corporation: Officers, Directors, and Accountants*, 63 Calif. L. Rev. 375, 403 (1975) ("[The Board] is optimally suited to . . . selecting, monitoring, and removing the members of the chief executive's office. It therefore follows that the primary objective of the legal rules governing the structure of corporate management should be to ensure effective performance of that cluster of functions . . . ." (footnote omitted)); Usha Rodrigues, *A Conflict Primacy Model of the Public Board*, 2013 U. Ill. L. Rev. 1051, 1075 (2013) ("Appointing a CEO, after all, is likely the most important decision a board will ever make.").

[298] *See* Hachigian Tr. 118.

74

struggle would inevitably ensue, reminiscent of the 2014 rift between the siblings and their cousins. Collins could appropriately grade Arthur on his success in working with the Company's concentrated stockholder base, which happened to be synonymous with his family.

Arthur also stresses the No Celebration Issue, which he claims was a pretext for acting against him. He points out that Frances and Hachigian viewed the media coverage as "[g]ood for value of stock" (i.e., good for the Company) but "less than ideal for family inclusion."[299] That was accurate.

At trial, Hachigian acknowledged his concern for the potential for the publicity to strengthen Arthur's position.[300] That perspective did not reflect loyalty to the sisters, but Hachigian's beliefs about the Company's best interests. At that point in the saga, Hachigian rationally doubted whether Arthur could change, and he had to anticipate the possibility that Arthur would need to be terminated. He also rationally believed that Arthur would fight back using the same walkout and boycott strategy that he deployed in 2014. Hachigian rationally concluded that it would have been better to sacrifice good publicity for the Company in the short term to avoid strengthening Arthur's hand, believing the Company would benefit over the long term because a weaker Arthur would be less likely to fight and more likely to change.

---

[299] JX 850 at 7; Hachigian Tr. 217–19.

[300] *See* Hachigian Tr. 221–23.

That type of tradeoff is one of the many decisions that independent and disinterested directors are entrusted to make.

Finally, Arthur asserts that "[t]he Company's best interests were clear: maintain its sixteen-year track record of exceptional performance and growth trajectory under Arthur's leadership."[301] To the contrary, that is not the only way to view the Company's best interests. The Current Directors could rationally believe that Arthur was not the only CEO who could manage the Company effectively. They also could rationally believe Arthur's inability to maintain good relations with the stockholders jeopardized the Company by risking an open war reminiscent of 2014, either in the near term or at a later date. Most significantly, the Current Directors could rationally believe that it was in the Company's best interests to address succession in the near term rather than allow the familial rift to fester further. The fact that the Current Directors did not back Arthur does not mean that they were loyal to the sisters, disloyal to the Company, or acted in bad faith.

### 4. Arthur's Claim About False Narratives

As additional evidence of bad faith, Arthur contends that the Current Directors invented false narratives. That is not accurate.

The first purportedly false narrative concerns the Budget and CapEx Issues. Recollections differ over whether the Board had previously asked for that type of

---

[301] Dkt. 142 at 37.

information and whether Arthur failed to provide it,[302] but Shea's testimony was persuasive. He admitted that "a lot of this stuff" on the Issues List "was not new to Terry [Carleton] and me."[303] He also agreed that the Issues List "certainly had to do with how [Arthur] was running the company and not doing things that the three board members and at least one shareholder thought he should be doing," which he observed "has been going on for—since God created the earth."[304] Not coincidentally, the Governance Initiatives from August 2022 addressed discretionary distributions

---

[302] For testimony that requests were made, see Collins Tr. 424–29, 441–43; Hachigian Tr. 25–29, 46, 204. For testimony that requests were not made, see Arthur Tr. 600; Carleton Tr. 846–48. In addition to testimony, Arthur relies on the Board minutes, noting that none of the minutes from 2019 through August 21, 2024, reflect any Board requests for budgets or CapEx information. That is not necessarily dispositive, because Batchelder, Arthur's personal attorney, generally drafted the minutes to "protect[] management." Batchelder Tr. 764. Although Hachigian and Collins initially fought over the depictions in the minutes, they became frustrated and gave up. *See* Hachigian Tr. 84; Collins Tr. 444–46. Arthur also points out that Batchelder's notes of each Board meeting did not contain specific requests. *See* Batchelder Tr. 738–42; *see, e.g.*, JX 835. That is perhaps more probative, but also dependent on the skill of the notetaker.

Arthur also claims that Hachigian repeatedly attempted to manipulate the contents of the meeting minutes with Collins' and Keyes' support. This is another area where recollections and interpretations can legitimately differ. To my eye, Hachigian sought to influence the drafting of the minutes so they both accurately reflected what he believed had occurred, while also thinking ahead to how the minutes would look in the context of a potential dispute. That is what corporate lawyers do. Batchelder did some of that too, but from the opposite perspective of "protect[ing] management." Batchelder Tr. 764.

[303] Shea Dep. 185.

[304] *Id.* at 191.

77

and the related need for greater information about capital expenditures.[305] In any event, Hachigian and Collins had long been asking for greater transparency, including forward-looking information about the business,[306] and on the CapEx Issue, a major frustration was that the Current Directors found out about new real estate purchases at the same time as the public.[307] The parties' different perspectives do not mean that the Current Directors created a false narrative about the Budget and CapEx Issues.

The next purportedly false narrative involves the Current Directors portraying the Issues List as mandatory directives. As romantic couples know, parties to the same conversation often recall it differently. During the active process of remembering, a person's recollections change. It is not surprising that the Current Directors could have viewed the Issues List as a set of requirements, while Arthur, Carleton, and Shea recalled them as proposals for discussion. That type of divergence is particularly common after litigation ensues, during which parties naturally reflect

[305] JX 111 at 3.

[306] Arthur's observation that the Board received quarterly historical financial information does not address the directors' requests for forward-looking information. The lack of budgets should have been easy to fix. In 2019, 2020, and 2021, the Board received an annual budget because the Company's loan documents required it. As soon as the loan was repaid, Arthur stopped providing it. *See* Arthur Tr. 610.

[307] The timing of those revelations was likely a result of bidder concern, because the Company's CFO did provide some CapEx information, but it was presented at a high level. *See* Mulligan Tr. 811–13; JX 57; JX 175; JX 395; JX 396. Hachigian also testified that he "was never worried about the company wasting money on CapEx." Hachigian Tr. 170.

78

on events from their own perspective. The more persuasive evidence indicates that the directors presented the Issues List in real time as a list of priorities but not specific mandates.[308] That said, the Issues List was a serious effort to identify Board expectations, and the Current Directors could rightly expect Arthur to make a constructive effort to address them. The Current Directors' recollections of a mandatory list of items does not constitute a false narrative constructed in bad faith.

The last purportedly false narrative involves the Current Directors' concern that Arthur and his allies were considering a walkout or boycott. Arthur argues that the Current Directors should not have relied on rumors, but their concerns had been building since August 2024. Arthur effectively dared the Current Directors to fire him in January 2025, and he went on an angry tirade against the Current Directors in March. In conjunction with the rumors about a walkout, Arthur unilaterally paid out employee bonuses as a thank-you for their support. The Current Directors could rationally believe that Arthur preparing for a fight and that they needed to act immediately. The Current Directors could also rationally conclude that the proper response involved suspending not just Arthur, but also his two lieutenants, his two children, and his brother-in-law pending an investigation.

Arthur objects that the Current Directors acted based on hearsay, but the rules of evidence do not apply in business settings. Arthur also complains that one of the sources was Michael, Frances' son, but the Current Directors knew that and could

---

[308] *See* Carleton Tr. 875–76; JX 129 at 1; JX 838.

assess his reliability. Arthur further argues that the Current Directors should have investigated before taking action, but that too was a business judgment for the Current Directors to make. "Information is not without costs of various kinds. Whether the benefit of additional information is worth the cost-in terms of delay and in terms of alternative uses of time and money-is always a question that may legitimately be addressed by persons charged with decision-making responsibility."[309] Put differently, the amount of information that a board determines is "prudent to have before a decision is made is itself a business judgment of the very type that courts are institutionally poorly equipped to make."[310] The Current Directors were already suspicious of Arthur. The rumors about a walkout or boycott found a favorable audience, but that is not bad faith.

Finally, it was not bad faith for the Current Directors to retain advisors, including public relations firms, and prepare a detailed strategy for securing the Board's ability to manage the Company. That was prudent.

Taken individually or collectively, Arthur's claims about false narratives do not establish bad faith. Instead, the evidence at trial demonstrated that the Current Directors were disinterested and independent, approached their duties with due care, and sought in good faith to benefit the Company and its stockholders as a whole. They

---

[309] *Solash v. Telex Corp.*, 1988 WL 3587, at \*8 (Del. Ch. Jan. 19, 1988) (Allen, C.).

[310] *RJR Nabisco*, 1989 WL 7036, at \*19.

made difficult business judgments under fraught circumstances. The business judgment rule protects their decision.

## B.     Arthur's Claim About Inequitable Action

In a separate argument, Arthur contends that the Current Directors acted inequitably toward their fellow directors Carleton and Shea, rendering their actions voidable. Arthur seeks to benefit indirectly from the consequences of the invalidity. That argument fails as well.

### 1.     The Wrongful Committee Theory

In the more straightforward version of his theory, Arthur contends that the Current Directors acted inequitably by forming the Executive Committee and excluding Shea. While it is theoretically possible that the extended use of a committee to exclude other directors could give rise to an equitable claim, this is not that case.

Section 141(c) empowers a board to form a committee. The scope of a committee's permissible authority turns on whether the corporation was formed before July 1, 1996. For a corporation formed on or after that date—like the Company—Section 141(c)(2) governs and states:

> The board of directors may designate 1 or more committees, each committee to consist of 1 or more of the directors of the corporation. . . . Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation, and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to the following matter: (i) approving or adopting, or recommending to the stockholders, any action or matter (other than the election or removal of directors) expressly required by this chapter to be

submitted to stockholders for approval or (ii) adopting, amending or repealing any bylaw of the corporation.[311]

Here, the Board validly acted to create the Executive Committee and empower it with the Board's full power and authority. That addresses any formation-related Berle I problem.

Arthur does not claim that the creation of the Executive Committee was statutorily invalid. He raises a Berle II challenge, making the operative question whether the Current Directors breached their fiduciary duties by creating the Executive Committee. Arthur does not argue that a standard of review more intense than the business judgment rule could apply to that decision, so the question becomes whether the Current Directors acted in bad faith. According to Arthur, the Current Directors acted in bad faith from the moment each of them joined the Board—and certainly (he believes) since the August 2024 Board meeting—by pursuing the best interests of his sisters rather than the best interests of the Company. If the court agreed, and if the Executive Committee was part of a bad faith scheme, then Arthur would have rebutted the business judgment rule. The Current Directors would have to show their actions were entirely fair, which they have not tried to do, so the formation of the Executive Committee would be invalid. But the court does not agree that the Current Directors acted in bad faith.

In a more targeted argument, Arthur contends that the Current Directors acted for the improper purpose of excluding Shea. As Arthur points out, a director's

---

[311] 8 *Del. C.* § 141(e).

82

"most fundamental right is the ability to participate in the board's collective deliberations and any resulting exercise of its power and authority over the business and affairs of the corporation."[312] Directors therefore could act in bad faith if they formed a committee to exclude a director for no other reason than an animus-driven desire to deprive the director of his rights. But if the directors had a rational basis for excluding the director, then they would not act in bad faith, and the business judgment rule would protect the decision.[313]

Boards routinely form committees when they wish to consult confidentially (including with counsel) without sharing information with another director, typically because the board believes the excluded director has a conflict or may use the information to the corporation's detriment. Here, the Current Directors rationally believed that Shea would share information with Arthur to the Company's detriment. They may have been wrong, but they believed subjectively and rationally that excluding Shea was necessary. That is all that's required.[314]

---

[312] *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *5 (Del. Ch. Jan. 22, 2015).

[313] *See Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006) (dismissing claim that directors acted in bad faith by forming committee to retaliate against director by excluding him).

[314] *See Zuckerberg I*, 250 A.3d at 895–96 ("The complaint also contends that Hastings (as a Netflix founder) is biased in favor of founders maintaining control of their companies. This allegation does not identify an interest of a bias-producing nature. A director could believe in good faith that it is generally optimal for companies to be controlled by their founders and that this governance structure is value-maximizing for the corporation and its stockholders over the long-term. Others might differ. As long as an otherwise independent and disinterested director has a rational

As a co-author and I have suggested elsewhere, "[i]f the director has been excluded for an extended period of time, and if the committee has been tasked with the full power of the board and is effectively carrying out the board's role, then the excluded director may have powerful equitable arguments in his favor."[315] That is because "[t]he DGCL establishes a board-centric system of corporate governance, not a committee-centric system, and the ability of a board majority to exclude minority directors stands in tension with the concepts of director involvement and collective deliberation."[316] The claim would be particularly strong if the reason for initially excluding the director no longer applied.

Whatever the prospects for such a claim might be, they do not exist in this case. Shea was excluded for a period of five months before his removal from the Board. During that time, the Current Directors' rational basis for excluding Shea remained pertinent. The business judgment rule therefore protected their ongoing decision to keep the Executive Committee in place.

---

basis for her belief, that director is entitled (indeed obligated) to make decisions in good faith based on what she subjectively believes will maximize the long-term value of the corporation for the ultimate benefit of its residual claimants. If a director believes that it will be better for the corporation to have the founder remain in control, then the director may make decisions to achieve that goal." (cleaned up)); *see generally The Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *16–22 (Del. Ch. Apr. 14, 2017).

[315] Laster & Zeberkiewicz, *supra*, at 60.

[316] *Id.*

## 2. The No-Trickery Theory

Arthur's other theory about inequitable Board conduct lumps together Delaware precedents involving (1) directors who deceive other directors into attending meetings and (2) board majorities who effectively conduct business outside of the board room so that the meetings become empty formalities. Those areas are related but distinct. This section addresses the no-trickery aspect.

### a. Pre-*Koch* Case Law

In 1915, *Lippman* first addressed the issue of trickery related to meeting attendance.[317] There, a director who had not received notice of the corporation's initial board meeting and who consequently did not attend the meeting challenged actions taken at the meeting. Chancellor Curtis wrote:

> It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful, and all acts done at such meeting are void. As to regular, or stated, meetings the rule is different. Presence at the meeting waives the notice, and so may a waiver be properly executed before the meeting, for there is still an opportunity to attend it.[318]

*Lippman* involved a special meeting, so the failure to give notice was fatal.

The policy rationale for the result in *Lippman* proved more significant for future cases.

> The reason and principle underlying these decisions is this: Each member of a corporate body has the right to consultation with the others

---

[317] *Lippman v. Kehoe Stenograph Co.*, 95 A. 895 (Del. Ch. 1915).

[318] *Id.* at 898 (citation omitted). Although *Lippman* referred to the actions as "void," in modern parlance they are voidable. *See Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1046 (Del. 2014).

and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result. If, however, they had notice and failed to attend they waived their rights; likewise if they signed a waiver of notice prior to the meeting . . . .[319]

Failing to properly provide notice was problematic because a director who did not receive notice could not decide to attend and participate: "Discretionary powers, questions of policy, business administration, all imply the personal attendance at the meeting, so that each director may have the benefit of not only the vote, but the voice of every other director, or at least of enough other directors to constitute a quorum."[320]

In two subsequent decisions, the Court of Chancery followed *Lippman* and held director action invalid when taken at a special board meeting where notice had not been given as the bylaws required.[321] Not until the *Schroder* decision in 1972 did the court go beyond testing for bylaw compliance to consider the equities of the

---

[319] *Lippman*, 95 A. at 899 (citation omitted).

[320] *Id.*; *see also In re Acadia Dairies, Inc.*, 135 A. 846, 847 (Del. Ch. 1927) (Wolcott, C.) (noting that a director cannot act *qua* director by proxy); *Lippman*, 95 A. at 897 (explaining that the reason a director cannot act by proxy is that "his associates are entitled to his judgment, experience and business ability, just as his associates cannot deprive him of his rights and powers as director").

[321] *See In re Seminole Oil & Gas Corp.*, 1958 WL 55434, at *1 (Del. Ch. July 30, 1958) (Seitz, C.) (holding board resolution passed at special meeting invalid because one director did not receive notice of the meeting and "[a]ll the directors were entitled to notice thereof"); *Bruch v. Nat'l Guar. Credit Corp.*, 116 A. 738, 740 (Del. Ch. 1922) (Wolcott, C.) ("Unless notice be given to each director of a special meeting of the board of directors as required by the by-laws, the meeting is illegal and action taken threat is not binding.").

situation.[322] *Schroder* involved two special board meetings. For the first, notice was not given to one director as the bylaws required, resulting in a straightforward application of *Lippman*.[323] For the second, the same director claimed not to have received notice, but the court found that "it was only because he refused to accept the two registered letters by which notice was sent."[324] Rejecting the director's position, the court held that "[o]ne cannot wilfully avoid receiving notice and then claim that he had none."[325] But the same director also asserted—and the court found—that the Chairman told him the meeting would be postponed, and the director relied on that representation in failing to attend. The court held that was sufficient to invalidate the meeting, stating:

> A quorum obtained by trickery is invalid, and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held.[326]

---

[322] *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431 (Del. Ch. 1972).

[323] *See id.* at 435 ("A special meeting held without due notice to all directors as required by the by-laws is not lawful and all acts done at such a meeting are void." (citing *Bruch*, 116 A. 738 and *Lippman*, 95 A. 895)).

[324] *Id.* at 436.

[325] *Id.*

[326] *Id.* (citation omitted). Here again the court referred to the actions as void, but in modern parlance they are voidable. *See Klaassen*, 106 A.3d at 1046.

Notably, the trickery in *Schroder* prevented the director from attending, thus comporting with *Lippman*'s reasoning that a director must have the opportunity to participate.

Next came *Pepsi-Cola*.[327] There, each stockholder agreed that the corporation could repurchase its shares if that stockholder failed to purchase a required amount of soda from the corporation. One stockholder (Pepsi-Cincinnati) secured an alternative source of soda and planned a campaign to change the purchase requirement. The president called an impromptu special board meeting on the day of the annual meeting of stockholders, as the bylaws empowered him to do. All directors were present. Realizing that the other directors intended to cause the corporation to repurchase its shares, the Pepsi-Cincinnati representative (Welch) objected and left. The board exercised the repurchase right.[328]

Pepsi-Cincinnati challenged the repurchase by contesting the validity of the special board meeting. Citing *Schroder* and *Trendley*, a decision from Missouri,[329] Pepsi-Cincinnati argued that Welch's attendance was obtained by trickery, claiming

---

[327] *Pepsi-Cola Bottling Co. v. Woodlawn Canners, Inc.*, 1983 WL 18017 (Del. Ch. Mar. 14, 1983).

[328] *Id.* at *4–7.

[329] *Trendley v. Ill. Traction Co.*, 145 S.W. 1 (Mo. 1912).

that he had been "lured into attendance because of the noticed shareholder meeting."[330] The court rejected this argument:

> I do not find Pepsi Cincinnati's authorities to be applicable to this situation. Both *Schroder* and *Trendley* turn on the inability of the duped director to participate meaningfully in the board's deliberations even though neither had the power to change the result. In *Schroder* the director was falsely told that the meeting had been rescheduled and thus he missed it. In *Trendley*, the director was in his office doing his daily work when other directors [unexpectedly] barged in so as to force a meeting at which they would constitute a majority. In the one case the director was not able to participate and in the other he was not prepared to do so.
>
> Here, Welch was present and could have participated had he chosen to remain. Secondly, he was accompanied by an official of his parent company and two attorneys for the company. . . . He was clearly familiar with the divergent viewpoints . . . . And he was certainly familiar with the workings of Woodlawn and its needs since he had been its president for five years and a director since its formation.
>
> In short, there is nothing to indicate that Welch was placed under any disadvantage by the impromptu calling of the special meeting . . . . In fact, there is every reason to believe that in all probability he was prepared to discuss the very things that were covered at the special meeting . . . .[331]

The court saw "no basis to declare the meeting illegal . . . simply because Welch had no advance notice," at least where there was "no invalidating trickery in calling the special meeting at a time when all directors were present" and could address the issues raised.[332]

---

[330] *Pepsi-Cola*, 1983 WL 18017, at *12.

[331] *Id.* at *12–13.

[332] *Id.* at *13.

### b. *Koch*

Nine years after *Pepsi-Cola*, *Koch* took a different approach.[333] A corporation had four directors: Stearn, Koch, Bunn, and Ginsberg. Stearn was the CEO and controlled a majority of the corporation's voting power. Koch was an outside director who owned preferred stock that carried the right to elect a fifth director if covenants were breached. Koch selected Bunn, and Stearn designated Ginsberg.[334] The corporation was running out of funds, and Stearn obtained an offer from a third party to provide $250,000 in financing secured by a first position lien on the corporation's assets. Koch offered to invest $2 million, conditioned on Stearn resigning and with a deadline for acceptance of April 2. On March 31, the directors met and discussed the two offers. Bunn and Ginsberg endorsed the third-party offer, but no formal action was taken. Stearn allowed the deadline for the third-party offer to pass.

On April 6, 1992, Bunn called a special board meeting for the following morning. He stated that the meeting was necessary in light of the company's "dire financial condition."[335] Later that day, Bunn sent Koch and Ginsberg draft resolutions that included Stearn's removal as CEO. The draft resolutions were not sent to Stearn.

During the meeting, Bunn asked Stearn whether he had reconsidered the

---

[333] *Koch v. Stearn,* 1992 WL 181717 (Del. Ch. July 28, 1992), *vacated as moot,* 628 A.2d 44, 46–47 (Del. 1993).

[334] *See id.* at *2.

[335] *Id.* at *3.

third-party offer. When Stearn said no, Bunn proposed removing Stearn as CEO and replacing him with Ginsberg. Koch seconded, and Koch, Bunn, and Ginsberg voted in favor. At some point, Stearn stated that he wanted to remove Ginsberg but was told he would have to deliver a stockholder written consent. Koch purported to name a fifth director.

Koch and the majority sued to confirm the validity of their actions. The court upheld Koch's election of a fifth director but invalidated Stearn's removal. The decision summarized the existing law as follows:

> The validity of the board action . . . depends upon whether Stearn was tricked or deceived into attending the meeting. If so, the general rule is that actions taken at such a meeting are void. Notwithstanding any deceit that may have been involved in calling a meeting, the actions taken will not be invalidated where the deceived director remains at the meeting and participates throughout, or where that director suffers no disadvantage in his ability to participate meaningfully in the meeting.[336]

The court recognized that Stearn likely suspected that his termination would be discussed and was capable of addressing the issue, but nevertheless held that "he was tricked into attending."[337] The trickery lay in the notice's reference to the company's financial condition while remaining "silent as to any possible consideration of the Koch offer, which had technically expired."[338] The court also noted that "the outside directors had an agenda, which included removing Stearn from office if he did not

---

[336] *Id.* at *4 (citations omitted). Here again the court referred to the actions as void, but in modern parlance they are voidable. *See Klaassen*, 106 A.3d at 1046.

[337] *Koch,* 1992 WL 181717, at *5.

[338] *Id.*

cooperate."[339]

In treating that as trickery, *Koch* departed from prior precedent in three significant ways. First, the decision adopted a different threshold for the trickery's significance. As demonstrated most clearly by *Pepsi-Cola*, earlier cases required trickery sufficient to cause a director not to attend a meeting at all or to be caught unprepared for an important decision.[340] In *Koch*, Stearn received notice of the special meeting, knew the gravity of the subjects to be discussed, and suspected his termination would be considered.[341] He chose to attend and participated in the deliberations. Nevertheless, the court held that trickery had occurred.

Second, *Koch* evaluated participation differently. *Koch* found that Stearn "did not vote or otherwise participate in the meeting after the resolution calling for his removal from office was presented."[342] Earlier cases looked to whether the director was sufficiently familiar with the issues to be able to participate, rather than whether the director chose to vote or speak. Stearn had the ability to discuss his own performance, and he objected to his removal.[343] After the vote on his removal, Stearn

---

[339] *Id.*

[340] *See Pepsi-Cola*, 1983 WL 18017, at *12–13.

[341] *Koch*, 1992 WL 181717, at *5 ("I agree that Stearn may have had some reason to suspect that his removal from office would be discussed on April 7th (as it was on March 31st) . . . .").

[342] *Id.*

[343] *Id.* at *4.

92

expressed his desire to remove Ginsberg and discussed other matters.[344] Yet *Koch* held that Stearn had not participated.

Third, the *Koch* decision broke new ground on disadvantage. The opinion stated:

> If Stearn had seen the draft resolutions before the meeting, he could have exercised his right to remove Ginsberg as a director and he could have replaced Ginsberg with another nominee who would vote with Stearn to block Stearn's removal. Without doubt, Stearn's inability to thus protect himself constituted a disadvantage. Thus, I conclude that the actions taken at the April 7th board meeting were void and of no effect.[345]

From *Lippman* through *Pepsi-Cola*, cases analyzed disadvantage in terms of a director's ability to discuss the matters raised during the meeting. The precedents had not considered a director's ability to exercise rights held in other capacities, such as stockholder voting rights, nor did they consider the director's ability to destabilize the board and preempt the board's decision. That reframing allowed a CEO to entrench himself contrary to the judgment of an independent board majority. More generally, it created an equitable mandate for directors to allow a board member to use a governance right before the board could act.

While the appeal was pending, Stearn resigned. The Delaware Supreme Court dismissed the appeal as moot and vacated the trial court decision so that it would not

---

[344] *Id.*

[345] *Id.* at \*5.

have any precedential effect.[346] In response to Stearn's motion for reargument, the justices reiterated the need for vacatur.[347]

If *Koch* were read narrowly to involve deception, then that aspect of the decision would make sense doctrinally, but it would be difficult to see what deception actually took place. The adverse action against Stearn was his removal, and he anticipated that his termination would be discussed and could address it. If, by contrast, *Koch* is read to impose a requirement that a board give an individual with a governance right a special preemptive opportunity to destabilize the board, then I regard *Koch* as wrongly decided.[348]

---

[346] *Stearn v. Koch*, 628 A.2d 44, 46–47 (Del. 1993).

[347] *Id.* at 47–48.

[348] *See OptimisCorp v. Waite* (*OptimisCorp I*), 2015 WL 5147038, at \*63 (Del. Ch. Aug. 26, 2015) (rejecting *Koch* as one of four cases that were "incorrectly decided" and "declin[ing] to follow those cases"), *aff'd,* 137 A.3d 970 (Del. 2016) (TABLE); *id.* at \*64 ("The Court cited no authority in support of its decision and I am aware of no case previously so holding. To the contrary, it long has been the law of Delaware that a Delaware corporation is managed by the directors. The *Koch* opinion, however, suggests that a CEO with board-appointment rights must receive notice of board action against him so that he can preempt the Board." (footnote omitted)); *id.* at \*66 (noting that *Koch* and two other decisions "threaten the fundamental premise of Delaware law that a corporation is managed by the board of directors"); *id.* at \*67 (noting that *Koch* and three other decisions "depart from key tenets of Delaware law [including that in] a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)"); *id.* (describing *Koch* as "unsound"). As discussed below, on appeal, the Delaware Supreme Court declined to express any view on the validity of *Koch. OptimisCorp v. Waite* (*OptimisCorp II*), 137 A.3d 970, 2016 WL 2585871, at \*2 (Del. 2016) (TABLE).

### c. *VGS*

The next decision on trickery is *VGS*.[349] An LLC had a three-member board of managers consisting of Castiel, Sahagen, and Quinn. Castiel was the CEO and controlled 75% of the LLC's voting power through two affiliates, one of which was an operating company in a related business. Sahagen owned the other 25% through a related business. Quinn was an independent outsider.

Sahagen came to believe that Castiel was using the LLC to support his related business, and Sahagen and Quinn decided that Castiel needed to be removed for the LLC to succeed.[350] The LLC's operating agreement authorized a board majority to act by non-unanimous written consent. Sahagen and Quinn executed a written consent causing the LLC to merge with and into a new Delaware corporation. Sahagen invested $10 million in the post-transaction entity and received equity in return. The merger flipped control from Castiel to Sahagen. The directors of the post-merger corporation were Sahagen and Quinn.

Neither the LLC agreement nor the Delaware Limited Liability Company Act required advance notice to Castiel, but the court held that Sahagen and Quinn owed fiduciary duties to Castiel that included giving him notice of their plan so he could preemptively defeat it. In reaching that conclusion, the court interpreted Castiel's

---

[349] *VGS, Inc. v. Castiel*, 2000 WL 1277372 (Del. Ch. Aug. 31, 2000), *aff'd*, 781 A.2d 696 (Del. 2001) (ORDER).

[350] At trial, "[m]any LLC employees and even some of Castiel's lieutenants testified that they believed it to be in the LLC's best interest to take control from Castiel." *Id.* at *2.

right to appoint managers under the LLC agreement as "guaranteeing [his] control over a three member board."[351] The court also construed Sahagen and Quinn's duty of loyalty as running to Castiel personally as the majority holder.[352] Based on those rulings, the court held that Sahagen and Quinn "owed Castiel a duty to give him prior notice even if he would have interfered with a plan that they conscientiously believed to be in the best interest of the LLC."[353]

The legal premises supporting that outcome find no support in Delaware law. Directors do not owe duties to those who appoint or elect them. Delaware decisions consistently reject the related concept of "constituency directors" as well as the notion that a director appointed by a particular minority stockholder or a particular class or series of stock can or should serve the particular interests of the appointing party.[354] Castiel's right to elect two directors did not mean he had a right to have those directors serve his own interests at the expense of the entity. Castiel's right to elect

---

[351] *Id.*

[352] *See id.* ("[T]hey failed to discharge their duty of loyalty *to him* in good faith." (emphasis added)).

[353] *Id.*

[354] *See generally* E. Norman Veasey & Christine T. Di Guglielmo, *How Many Masters Can a Director Serve? A Look at the Tensions Facing Constituency Directors,* 63 Bus. Law. 761 (2008) (summarizing Delaware case law).

two directors also did not mean that he had a right to block a board majority from approving a merger that would divest him of that right.[355]

Directors do not owe fiduciary duties to individual stockholders; they owe duties to the corporation and its stockholders as a whole.[356] This is true even if a single stockholder holds a controlling block. Equity will protect a controlling stockholder against the dilution of its position when a board acts for an improper purpose, such as entrenchment, that is contrary to the interests of the entity and all of its stockholders,[357] but a board otherwise does not have a duty to protect the

---

[355] *See In re P3 Health Gp. Hldgs., LLC*, 2022 WL 16548567, at \*13 (Del. Ch. Oct. 31, 2022) (rejecting argument that a contractual obligation to maintain a board of a certain size with minority representation "conferred a consent right over any merger that causes the Company's separate existence to cease because that event decreases the size of the Board to zero by eliminating it"; noting that "Delaware decisions have made clear that if a party wants a consent right that applies to mergers generally, or which applies to mergers that have the effect of altering, amending, or eliminating a special right that the party possesses, then the consent right must refer specifically to a merger" (citing *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854–55 (Del. Ch. 1998)).

[356] *See, e.g., Unocal*, 493 A.2d at 955 ("[C]orporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010) (explaining that directors' fiduciary duties include "acting to promote the value of the corporation for the benefit of its stockholders").

[357] *See Mendel v. Carroll*, 651 A.2d 297, 304 (Del. Ch. 1994) (Allen, C.) (holding "if the principal motivation . . . is simply to maintain corporate control ('entrenchment') it would violate the norm of loyalty" (citing *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del. Ch. 1967) and *Can. S. Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del. Ch. 1953))); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at \*8 (Del. Ch. Aug. 27, 1987) (Allen, C.) (same); *see also Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007) (explaining that outside of the electoral context, directors can pursue a course of action contrary to the wishes of a stockholder majority if they satisfy enhanced scrutiny); *Blasius Indus., Inc. v. Atlas*

controller. A board acting loyally may take action to oppose, constrain, or even dilute a large or controlling stockholder.[358] "Where . . . a board of directors acts in good faith and on the reasonable belief that a controlling shareholder is abusing its power and is exploiting or threatening to exploit the vulnerability of minority shareholders, . . . the board might permissibly take such an action."[359]

If *VGS* were read narrowly to involve deception, then the decision would make sense doctrinally. But even more so than with *Koch*, it is difficult to see how any deception occurred. The LLC's operating agreement authorized a board majority to act by non-unanimous written consent without any notice to Castiel, and that is what

---

*Corp.*, 564 A.2d 651, 659–62 (Del. Ch. 1988) (Allen, C.) (recognizing that board can, consistent with its fiduciary duties, take action that interferes with a stockholder majority given a sufficiently compelling justification).

[358] *See, e.g.*, *Hollinger Int'l, Inc. v. Black* (*Hollinger I*), 844 A.2d 1022, 1088 (Del. Ch. 2004) (approving board's deployment of rights plan to prevent controlling stockholder from selling block of shares to third party), *aff'd*, 872 A.2d 559 (Del. 2005); *Mendel*, 651 A.2d at 306 ("I continue to hold open the possibility that a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from exploitation by a controlling shareholder who was in the process or threatening to violate his fiduciary duties to the corporation . . . ."); *Blasius*, 564 A.2d at 662 n.5 (suggesting hypothetical that could support dilutive action); *Phillips*, 1987 WL 16285, at *7 ("[*Unocal*] teaches that the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat."); *see also La. Mun. Police Emps.' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *8 & n.34 (Del. Ch. July 28, 2009) (declining to dismiss claim that board breached its fiduciary duties by failing to employ a rights plan to block a creeping acquisition by a large and arguably controlling stockholder when considered "together with other suspect conduct").

[359] *Mendel*, 651 A.2d at 304.

they did. The court wrote that advance notice was necessary to give Castiel a "level playing field on which to defend his interest,"[360] but because Castiel could appoint a majority of the board, advance notice did not "level" the playing field. It slanted the playing field in Castiel's favor.

To my eye, *VGS* openly established an additional equitable notice requirement for a director-CEO who can take preemptive action to reconstitute the board. I regard the case as wrongly decided.[361]

### d. *Adlerstein*

The next trickery decision is *Adlerstein*.[362] A corporation's board consisted of Adlerstein, Mencher, and Wertheimer. Adlerstein was the founder, CEO, and controlled over 70% of its voting power. Mencher and Wertheimer were independent outsiders. In 2000, the corporation's financial condition deteriorated. In March 2001, Adlerstein was hit with a sexual harassment complaint, and an internal investigation found that he was guilty and had been less than candid during the investigation. In April, a financial consultant projected that the corporation would run out of cash by

---

[360] *VGS*, 2000 WL 1277372, at *4.

[361] *See OptimisCorp I*, 2015 WL 5147038, at *63 (rejecting *VGS* as one of four cases that were "incorrectly decided" and "declin[ing] to follow those cases"); *id.* at *67 (noting that *Koch*, *VGS*, and two other decisions "depart from key tenets of Delaware law [including that in] a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)"); *id.* (describing *VGS* as "unsound"). In the appeal from *OptimisCorp I*, the Delaware Supreme Court declined to express any view on *VGS*. *See OptimisCorp II*, 2016 WL 2585871, at *2.

[362] *Adlerstein v. Wertheimer,* 2002 WL 205684 (Del. Ch. Jan. 25, 2002).

May 31. At an April 30 board meeting, Mencher and Wertheimer expressed concern about the corporation's cash position, but Adlerstein argued that he had found money before and would again. The divergence of opinion persisted during a meeting on May 25. At that meeting, the board hired a restructuring consultant, but Adlerstein interfered with the consultant's work. Wertheimer then contacted three of the company's four department heads and learned they planned to quit. The consultant told Wertheimer and Mencher that Adlerstein was "the central problem" and "must be removed."[363]

To address the crisis, Wertheimer contacted Ira Reich, a third-party investor. After meeting with Adlerstein, Reich refused to invest unless Adlerstein resigned.

On July 2, 2001, Wertheimer, Mencher, and Reich discussed firing Adlerstein. Adlerstein did not know about the meeting. At the time, the corporation could not meet payroll, and key vendors were withholding deliveries, yet Adlerstein refused to meet with creditors.

On July 5, 2001, Wertheimer asked Adlerstein to attend a special board meeting on July 9. The court found that

> Adlerstein was aware that the topics to be discussed at the meeting would be (i) SpectruMedix's dire financial condition and immediate need for cash, (ii) [a pending] arbitration, including the need to retain new counsel, (iii) the formal execution of an agreement to retain [the restructuring consultant], and (iv) the Company's certified public accountants' refusal to issue an audit opinion.[364]

---

[363] *Id.* at *4.

[364] *Id.* at *5.

In advance of the meeting, Reich made a formal proposal to invest, and Wertheimer, Mencher, and Reich held another teleconference about firing Adlerstein. Deal documents were circulated in draft form by July 6. Adlerstein was not told of the proposal, the teleconference, or the draft documents.

During the meeting on July 9, 2001, Adlerstein began to discuss the arbitration. Wertheimer interrupted and told Adlerstein the board needed to address the corporation's finances. Wertheimer stated that Reich had made a proposal and handed Adlerstein a term sheet. After reviewing it, Adlerstein said he was not interested because it would deprive him of control. Wertheimer and Mencher responded that, in their judgment, the company needed funds immediately. They asked Adlerstein if he could provide funding, and Adlerstein said no. Wertheimer and Mencher tried to have further dialogue about alternatives, but Adlerstein refused. Wertheimer then moved for a vote on the transaction, and he and Mencher voted in favor. Wertheimer and Mencher next discussed removing Adlerstein for cause from his positions as Chairman and CEO, which they did. After the meeting, Reich's investment vehicle, which now held a majority of the outstanding voting power, delivered a written consent removing Adlerstein as a director.

When Adlerstein challenged the actions taken at the meeting, the court found that the meeting was validly called and convened. The court then turned to the "more difficult issue" of whether the decision to keep Adlerstein uninformed about their plan

rendered their actions invalid.[365] The decision cited factors weighing in favor of validity.[366] Nothing in the charter or bylaws required prior notice of agenda items, and Delaware common law did not require it either. Wertheimer and Mencher acted in good faith. And the corporation faced insolvency such that fast action was needed.

Relying on *Koch*, the court nevertheless concluded that Adlerstein had an equitable right to (i) advance notice of the other directors' plans and (ii) an opportunity to exercise his voting power as a stockholder to reconstitute and preempt the board. The opinion did not discuss that *Koch* had been vacated or consider its departures from prior case law.

In a footnote, the decision noted the unique nature of the equitable notice right, stressing that "[t]he outcome in this case flows from the fact [that] Adlerstein was both a director and a controlling stockholder, not from either status individually."[367] The decision recognized that Adlerstein would not be entitled to notice as a stockholder:

> In the absence of some special contractual right, there is no authority to support the argument that Adlerstein's stockholder status entitled him to advance notice of actions proposed to be taken at a meeting of the board of directors. The actions may be voidable if improperly motivated. But the absence (or presence) of notice is not a critical factor.[368]

---

[365] *Id.* at *9.

[366] *Id.*

[367] *Id.* at *9 n.28.

[368] *Id.* (citation omitted).

The decision also recognized that Adlerstein would not have an equitable right to advance notice as a director. "Similarly, in the absence of a bylaw or other custom or regulation requiring that directors be given advance notice of items proposed for action at board meetings, there is no reason to believe that the failure to give such notice alone would ordinarily give rise to a claim of invalidity."[369]

Yet despite acknowledging those settled propositions, the decision concluded that the two capacities together gave rise to a trumping hybrid notice right:

> Nevertheless, when a director either is the controlling stockholder or represents the controlling stockholder, our law takes a different view of the matter where the decision to withhold advance notice is done for the purpose of preventing the controlling stockholder/director from exercising his or her contractual right to put a halt to the other directors' schemes.[370]

It remains unclear how nothing plus nothing somehow requires directors to facilitate their own removal.

If *Adlerstein* could be regarded as a decision about deception, then it would be doctrinally understandable. As with *VGS*, it is not clear how it could be recharacterized in that fashion. Instead, the decision openly established an extra notice obligation for a particular type of director. In my view, *Adlerstein* was wrongly decided.[371]

---

[369] *Id.*

[370] *Id.*

[371] *See OptimisCorp I*, 2015 WL 5147038, at *63 (rejecting *Adlerstein* as one of four cases that were "incorrectly decided" and "declin[ing] to follow those cases"); *id.* at *66 (noting that *Koch, Adlerstein,* and a third decision "threaten the fundamental

### e. *Fogel*

The next trickery decision is *Fogel*.[372] U.S. Energy was a publicly traded Delaware corporation that fell into financial difficulty. Fogel was the company's Chairman and CEO. He scheduled a special board meeting to interview and hire a restructuring officer. In the days leading up to the meeting, the three independent directors discussed their concerns about Fogel's performance and reached a consensus that Fogel should be terminated. On the morning of the meeting, the three directors decided to fire Fogel. Before the meeting began, the directors told Fogel that they had lost faith in him and wanted him to resign. Fogel disputed that they could fire him, then left. The three directors remained, convened the meeting, and conducted the interviews. That evening, one of the directors called Fogel and asked whether he agreed to resign. When Fogel declined, the director told him he was terminated.[373]

---

premise of Delaware law that a corporation is managed by the board of directors"); *id.* at *67 (noting that *Koch*, *VGS*, *Adlerstein*, and a fourth decision "depart from key tenets of Delaware law [including that in] a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)"); *id.* (describing *Adlerstein* as "unsound"). In the appeal from *OptimisCorp I*, the Delaware Supreme Court declined to express any view on *Adlerstein. See OptimisCorp II*, 2016 WL 2585871, at *2.

[372] *Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978 (Del. Ch. Dec. 13, 2007).

[373] *Id.* at *1–2.

Fogel sued to challenge his removal. The central issue was whether a board meeting took place. After conducting a trial, the court found that a board meeting had not occurred and that Fogel therefore had not been terminated.[374]

As an alternative basis for its holding, the court found that the meeting "was not properly noticed."[375] Relying heavily on *Koch*, the opinion characterized the directors as having tricked Fogel about the true purpose of the meeting, even though Fogel called it himself and even though the directors engaged with Fogel about his resignation before the meeting began. Like *Adlerstein*, *Fogel* credited that the directors had acted in good faith. The decision nevertheless held that the directors deceived Fogel by not specifically warning him further in advance about his potential termination as CEO.[376]

Fogel was not a controlling stockholder, and the decision recognized that he lacked the votes to protect his position. Fogel also had the opportunity to attend the meeting and discuss his potential termination. Nevertheless, the court held that he was disadvantaged because "had he known beforehand, he could have exercised his

---

[374] *Id.*

[375] *Id.* at *4.

[376] *See id.* ("At trial, the independent directors argued passionately that they believed terminating Mr. Fogel was in the best interests of the Company and that their decision to do so was undertaken in good faith. That may be so, but deceiving Mr. Fogel about their intentions by omission is not appropriate." (citing *Adlerstein*, 2002 WL 205684, at *11)).

right under the bylaws to call for a special meeting *before* the board met."[377] In other words, even though Fogel lacked the ability to change the board's composition himself, the board had to give him the opportunity to ask the stockholders to do it for him, and the board could not remove Fogel unless they did.

*Fogel* did not discuss that *Koch* had been vacated or consider its departures from precedent. The opinion did not consider whether by calling a special meeting of stockholders to protect his job, Fogel would act for the improper purpose of entrenchment. The opinion did not discuss how forcing the board to give Fogel that opportunity enabled a CEO to pre-empt the decision of an independent board majority.

Corporate bylaws commonly contain a provision conferring the power to call a special meeting on either the Chairman of the Board, the senior-most corporate officer, such as the CEO or President, or both.[378] If *Fogel* is correct, then a board with a Chairman/CEO who can call a meeting of stockholders cannot fire its CEO without

---

[377] *Id.*

[378] *See, e.g.*, *Shaw v. Agri-Mark, Inc.*, 663 A.2d 464, 465–66 (Del. 1995) (empowering chairman to call special meeting of stockholders); *Perlegos v. Atmel Corp.*, 2007 WL 475453, at *25 (Del. Ch. Feb. 8, 2007) (same); *Kidsco Inc. v. Dinsmore*, 674 A.2d 483, 487 n.4 (Del. Ch. 1995) (same); *Campbell v. Loew's, Inc.*, 134 A.2d 852, 855–56 (Del. Ch. 1957) (Seitz, C.) (empowering president to call special meeting of stockholders). *See generally* 2 David A. Drexler et al., *Delaware Corporation Law & Practice* § 24.02, at 24-3 (2012) ("[I]n many instances, bylaws give the power to call special meetings to the chief executive officer, a specified number of the directors, and a fixed percentage of stockholders entitled to vote."); 2 Alan S. Gutterman, *Business Transaction Solutions* § 8.52 (2013) ("Special meetings . . . may be typically called by the corporate secretary, the chairman of the board, the president or other authorized people described in the bylaws.").

first giving the CEO explicit advance notice and an opportunity to call a special meeting at which the stockholders can potentially change the composition of the board, regardless of how few shares the Chairman/CEO owns.

If *Fogel* involved deception, then its holding is doctrinally understandable. But as with *VGS* and *Adlerstein*, it is not clear how the decision involved deception. The decision instead granted an extra equitable notice right to a director with the ability to call a special meeting. In my view, *Fogel* was wrongly decided.[379]

### f.    *OptimisCorp*

The next trickery decision is *OptimisCorp*.[380] OptimisCorp was a privately held company that provided physical therapy services and software. Morelli was its Chairman and CEO and a large minority stockholder. After an acquisition, the stockholders entered into an agreement that effectively gave Morelli the right to designate five of the board's nine members.[381] After an investigation concluded that

---

[379] *See OptimisCorp I*, 2015 WL 5147038, at *63 (rejecting *Fogel* as one of four cases that were "incorrectly decided" and "declin[ing] to follow those cases"); *id.* at *66 (noting that *Koch*, *Adlerstein*, and *Fogel* "threaten the fundamental premise of Delaware law that a corporation is managed by the board of directors"); *id.* at *67 (noting that *Koch*, *VGS*, *Adlerstein*, and *Fogel* "depart from key tenets of Delaware law [including that in] a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)"); *id.* (describing *Koch*, *VGS*, *Adlerstein*, and *Fogel* as "unsound"); *id.* (describing *Fogel* as "unsound"). In the appeal from *OptimisCorp I*, the Delaware Supreme Court declined to express any view on *Fogel*. *See OptimisCorp II*, 2016 WL 2585871, at *2.

[380] *OptimisCorp*, 2015 WL 5147038.

[381] *Id.* at *23.

107

Morelli had engaged in sexual harassment, the board terminated him and attempted to amend the stockholders' agreement so he could no longer elect a majority of the board. The court found that Morelli anticipated that the board meeting would be about his termination and came prepared to fight it.[382]

Morelli successfully invalidated the board's attempt to amend the stockholders' agreement and used his contractual rights to regain control. He then sued four of the directors, claiming they acted in bad faith by plotting to terminate him and calling a board meeting without telling him in advance that his termination would be considered.[383] The trial court held that the directors did not breach their fiduciary duties by not giving Morelli advance notice of his prospective termination so he could defeat the effort by reconstituting the board. The court declined to follow *Koch*, *VGS*, *Adlerstein*, and *Foley*, reasoning that the equitable notice requirement that those decisions recognized lacked support in precedent and conflicted with Section 141(a) of the DGCL, the board-centric underpinning of Delaware law.[384] The court explained

---

[382] *Id.* at *50.

[383] *Id.* at *63 (describing Morelli's claim that "as a director and controller, [he] was entitled to advance notice of the October 20 Meeting and a chance to exercise his contractual rights and reconstitute the Board. By depriving him of that right, [the directors] allegedly breached their duty of loyalty" (footnote omitted)).

[384] *Id.* at *66 ("Plaintiffs rely on this line of cases, including primarily *Adlerstein* and *VGS,* for the proposition that it was a breach of the duty of loyalty for the Director Defendants not to provide Morelli fair notice of their intent to remove him and allow him to exercise his rights under the Stockholders Agreement. To the extent that one or more of the cases on which Plaintiffs rely can be read to stand for that proposition, I decline to follow those cases."); *id.* ("At least three of the four cases just discussed threaten the fundamental premise of Delaware law that a corporation

that if Morelli had an absolute blocking right against board action by virtue of his right to elect five directors under the stockholders' agreement, then "[t]his would make him, for all intent and purposes, a super-director whose powers trump the board's statutory authority under Section 141(a)."[385] The court found that "none of the Director Defendants breached their duty of loyalty by not advising Morelli in advance of his potential termination."[386]

On appeal, the Delaware Supreme Court affirmed in a summary order. Writing for the court, Chief Justice Strine took pains to criticize the "'super-director' theory," which he characterized as a "tendentious description."[387] As he interpreted it, that label "obscures the core equitable question, which is whether all directors are entitled to fair and non-misleading notice of the agenda for a special meeting."[388] But far from obscuring that issue, the super-director theory focused on precisely that question: it

---

is managed by the board of directors."); *id.* ("In my view, the holdings of these cases depart from key tenets of Delaware law. In a Delaware corporation, the directors of the corporation manage the corporation and that principle is statutorily enshrined in Section 141(a)."); *id.* at *67 ("I find the case law supporting Plaintiffs' argument to be unsound and I decline to follow it.").

[385] *Id.* at *67 (cleaned up).

[386] *Id.*

[387] *OptimisCorp II*, 2016 WL 2585871, at *2. Somewhat ironically, activist directors are now "commonly termed as 'super-directors,'" not because they claim greater rights (as did the director-CEOs in *Koch* and its progeny), but simply because they have the informational advantages necessary to provide a meaningful check on management. Kobi Kastiel & Yaron Nili, *"Captured Boards": The Rise of "Super Directors" and the Case for a Board Suite*, 2017 Wis. L. Rev. 19, 23 (2017).

[388] *OptimisCorp II*, 2016 WL 2585871, at *2.

responded to and rejected the argument that a director was entitled to *extra* advance notice in equity if the director could potentially reconstitute the board and prevent the adverse action. But although it mischaracterized the super-director theory, that passage helpfully refocused the inquiry on the notice that every director was entitled to receive, consistent with the pre-*Koch* cases culminating in *Pepsi-Cola*.

Continuing, Chief Justice Strine wrote that the super-director theory "seems to assume that if all directors are required to be given fair notice of the agenda for a special meeting, a director with board appointment rights might in some cases use them, and thereafter elect new directors."[389] Again, that was not what the super-director theory addressed. *Koch*, *VGS*, *Adlerstein*, and *Fogel* posited that a director was entitled to *additional* notice in equity if the director could invoke a governance right that could destabilize the board. *Adlerstein* made that point explicit by explaining that neither a director nor a controlling stockholder would have been entitled to notice, but that somehow a director who was also a controlling stockholder was entitled to affirmative notice.[390]

Chief Justice Strine then penned the line for which the order is remembered:

---

[389] *Id.*; *see id.* at *3 ("Biasing that analysis by describing it as involving the creation of a class of 'super directors' is unhelpful. Although it may be that directors who own large amounts of stock and have considerable voting power are entitled to no more fair notice than independent directors, surely they are entitled to equal treatment and we doubt that one would label independent directors 'super directors' if they complained after being blindsided by a board majority at a special meeting."). To reiterate, the CEO-directors in *Koch*, *VGS*, *Adlerstein*, *Fogel*, and *OptimisCorp* demanded *more* notice than directors would get.

[390] *Adlerstein,* 2002 WL 205684, at *9 n.28.

As important, we are reluctant to accept the notion that it vindicates the board's right to govern the corporation to encourage board factions to develop Pearl Harbor-like plans to address their concerns about the company's policy directions or the behavior of management. Rather, it has long been the policy of our law to value the collaboration that comes when the entire board deliberates on corporate action and when all directors are fairly accorded material information. The Court of Chancery's opinion can be read as indicating that a board faction may engage in deception toward other board members in giving notice of what a special meeting should address so long as the faction subjectively believes that its intended end is good for the corporation. Nothing in our affirmance should be read as endorsing that view, or as expressing any view on a line of fact-specific rulings where inequity was found in deceiving a director about the action intended to be taken at a board meeting.[391]

He added, "we are uncomfortable embracing the idea that cliques of the board may confer and sandbag a fellow director."[392]

What the trial court addressed was the CEO-director's demand for *additional* notice, not the *same* notice. Notably, under the order's framing, describing a CEO-director who claimed a special equitable notice right as a "super-director" is "tendentious," but the eight other members of the nine-member board who attempted to remove the CEO after an investigation found that he engaged in sexual harassment become a "clique[]" and "board faction" who developed "Pearl Harbor-like plans" to "sandbag" the CEO.

---

[391] *OptimisCorp II*, 2016 WL 2585871, at *3.

[392] *Id.* at *2.

Interestingly, Chief Justice Strine's discussion of the facts in *OptimisCorp* emphasized the board's ill-fated attempt to amend the stockholders' agreement, not Morelli's termination. He wrote:

> Although the Court of Chancery found that Morelli had sensed that the October 20, 2012 meeting would involve consideration of the sexual harassment investigation against him, the Court of Chancery cited no evidence that Morelli (or certain other board members) received any notice that an amendment to the stockholders agreement that would strip Morelli of his power to appoint a majority of the board would be considered at the special meeting. In fact, the record suggests that certain of the defendant directors concealed that intention in advance of the meeting.[393]

That passage notably does not suggest that Morelli needed to be given specific notice of the officer-level termination that he anticipated would take place.

Relatedly, Chief Justice Strine emphasized the importance of "the rights that large stockholders often procure in connection with their decision to invest in a corporation, either through monetary or human capital," which he viewed the trial court has having "trivialize[d]."[394] He wrote:

> When a board faction calls a special meeting, and is dishonest about its intention to use that meeting to alter a stockholder's board appointment rights, the Court of Chancery's analysis should involve a considered evaluation of whether intentional duplicity toward fellow board members is consistent with the fiduciary duties those directors owe to the company and its stockholders, including stockholders who are entitled to rely upon stockholder agreements executed in conformity with the DGCL.[395]

---

[393] *Id.* at *2 n.5.

[394] *Id.* at *3.

[395] *Id.*

Again, that is not what the Court of Chancery did. To reiterate, the trial court was not dealing with duplicity about what would happen at the meeting. The trial court found that Morelli knew the issue was coming and arrived ready to fight. The trial court rejected Morelli's demand for *extra* equitable notice of his potential ouster that went beyond what he was entitled to under the charter, the bylaws, and even the stockholders' agreement.

That last point bears emphasizing. The trial court recognized that Morelli had the right to designate a majority of the board. If the stockholders' agreement had given Morelli a right to advance notice, the court would have enforced it. What the court declined to do was to give Morelli an *implied* right to *additional* notice, simply because he had the contractual right to designate a majority of the board. Presumably that implied right would arise under the implied covenant of good faith and fair dealing, but the Delaware Supreme Court has stressed that the implied covenant should *not* be used to give counterparties rights they did not obtain at the bargaining table. An implied or equitable notice right would do just that.[396]

---

[396] *See Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at *24 (Del. Ch. Oct. 28, 2020) (rejecting argument that implied covenant granted executive a right to notice that his resignation letter could permit the company to repurchase his equity; holding that to imply a right to notice would give the executive "contractual protections he failed to secure for himself at the bargaining table"); *see generally Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 881 (Del. 2015) (explaining that Delaware law "prevents a party who has after-the-fact regrets from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table"); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) ("When, as is the case here, the relevant contracts expressly grant the plaintiffs certain rights, . . . the court cannot

For reasons that are unclear, the "super-director" label seems to have been triggering, and it generated a greater and opposite rhetorical reaction from the appellate tribunal. In substance, however, *OptimisCorp II* helpfully refocused the analysis on (1) affirmative deception and (2) whether the adversely affected director received the same notice that other directors were entitled to receive.

### g. *Bäcker*

Six years after the summary order in *OptimisCorp II*, the Delaware Supreme Court confirmed its implications in *Bäcker*.[397] That decision made express what *OptimisCorp II* suggested (but obscured with hyperbolic language). First, an affirmative misrepresentation that induces a director to attend a board meeting renders action taken at the meeting voidable, regardless of whether it is a regular or special meeting. Second, because regular meetings do not require notice or an agenda in advance, silence about what issues a party will raise at a regular meeting does not constitute trickery sufficient to render action taken at that meeting voidable. Third, because a special meeting requires meaningful notice about the items to be considered, the material omission of an item that the party calling the meeting intends to raise can constitute trickery rendering the action voidable.

---

read the contracts as also including an implied covenant to grant the plaintiff additional unspecified rights. . . . To do so would be to grant the plaintiffs, by judicial fiat, contractual protections that they failed to secure for themselves at the bargaining table."), *aff'd*, 861 A.2d 1251 (Del. 2004).

[397] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81 (Del. 2021).

*Bäcker* involved self-interested action by a founder and former-CEO and his father. The corporation's board had five seats but only four directors: (i) Alex Bäcker, who founded the company in 2009 and served as its CEO until his removal in June 2019, (ii) Alex's father, (iii) Jeff Anderson, the appointee of a large investor, and (iv) Ivan Markman, an independent director. After terminating Alex and hiring a new CEO in September 2019, the board's next regular meeting was scheduled for November 15. The CEO circulated materials that contemplated filling the vacancy, expanding the size of the board to six, and filling the newly created directorship with the CEO.[398]

Alex realized that if Markman resigned, then he and his father would hold a two-seat majority on a three-seat board. He spoke with Markman about the possibility, and Markman resigned on November 14. Alex then prepared a set of resolutions firing the CEO, appointing himself as both CEO and CFO, appointing an ally to the board, and amending the bylaws to provide that three directors would constitute a quorum. That combination would give Alex, his father, and his ally control over the company. When the company's counsel asked Alex and his father to approve different resolutions filling Markman's vacancy with a different director, they ignored them. At the board meeting, they pushed through their resolutions and secured control.

[398] *Id.* at 88.

115

In the resulting litigation, the trial court found that Alex and his father affirmatively misrepresented their support for the CEO's resolutions while secretly planning to implement their own resolutions after Markman's resignation. The trial court also found that the affirmative misrepresentation induced Anderson to attend the meeting, which provided a quorum so Alex and his father could act. On appeal, the Delaware Supreme Court affirmed that factual finding and held it was sufficient to render the actions taken at the meeting voidable.[399] By focusing on their partial disclosure, the justices aligned the notice analysis with Delaware disclosure law generally, albeit at the board level. For Alex and his father, the breach of duty was particularly clear: Alex was self-interested in their plan to restore Alex to the CEO seat, and his father was not disinterested. They thus acted with *scienter* and disloyally.

Alex and his father argued that the Court of Chancery's ruling established an equitable notice requirement for regular meetings, but the Delaware Supreme Court rejected that argument. Reiterating that notice was not required for regular

---

[399] *Id.* at 101 ("This was an affirmative statement. Alex made the statement *after* Markman resigned. And the statement was deceptive and misleading on its face. At that point, Alex knew that he held a board majority, and Alex had left Markman with the impression that he wanted to fire Grauman. Therefore, Alex must have known that the draft resolutions Alderton circulated earlier in the week were now a dead letter. Nonetheless, Alex asked that Grauman share his draft resolutions with Anderson and others 'so that we may all do our homework.' There was no reason for Grauman to prepare for a meeting from which he would be excluded and at which he would be fired. And there was no reason for Anderson or Grauman to study resolutions that Alex knew the board would not consider. It is not erroneous to find that this statement was deceptive." (footnote omitted)).

meetings, the Delaware Supreme Court distinguished between remaining silent in that context and making an affirmative disclosure that was partial and therefore affirmatively misleading.[400] The latter could render board action voidable, even in connection with a regular meeting. The justices noted that for a special meeting where the charter or bylaws requires notice of the items to be considered, then "false or misleadingly incomplete special meeting notices" could render board action voidable.[401]

For reasons that are unclear to me, the decision then recharacterized *Koch* and *Adlerstein* as cases involving that type of deception, rather than as cases recognizing an extra equitable notice obligation owed to a director or officer with a right that could de-stabilize the board.[402] That *Bäcker* went out of its way to validate *Koch*, *VGS*, *Adlerstein*, and *Fogel* by recasting them as decisions involving deception suggests that to the extent those cases recognized an extra equitable notice obligation for directors or officers with board-destabilizing rights (which *Adlerstein* did explicitly and the other decisions did implicitly), then they are no longer good law. After all, if that aspect of the decisions was valid, then the *OptimisCorp II* and *Bäcker* decisions could have simply cited them for that requirement and endorsed it. Instead, *Bäcker* recast the three precedents as involving deception, even though a review of the facts

---

[400] *Id.* at 105.

[401] *Id.*

[402] *Id.* at 97.

of each decision makes it hard to perceive when or how the deception took place. In my view, because *Koch*, *VGS*, *Adlerstein*, and *Fogel* did not involve deception, the cases should properly be viewed as overruled.

Underscoring the Delaware Supreme Court's focus on the concept of a misleading partial disclosure, *Bäcker* confirmed that directors owe a duty of candor to their fellow directors. "Regardless of the type of meeting or form of communications, Delaware law does not countenance deception designed to manufacture a quorum or otherwise induce director action."[403] Alex and his father acted deceptively by making statements implying support for the CEO's resolutions and the absence of other business, while actually planning to use their unexpected two-to-one board-level majority to take radically different and self-interested action.[404]

---

[403] *Id.* at 107.

[404] *Id.*

Since *Bäcker*, Court of Chancery cases have focused on the issue of deception.[405] Of course, that baseline inquiry does not prevent parties from agreeing to specific contractual requirements for notice for governing-body action.[406]

### h.    The No-Deception Rule In This Case

Arthur contends that the Current Directors engaged in inequitable trickery and deception in this case. Under *Bäcker* and the law as it now stands, that is not so.

As evidence of trickery and deception, Arthur points to the fact that the Current Directors (i) concealed the Issues List from Carleton until the start of the executive session at the August 2024 Board meeting and (ii) removed Shea from the Chair position at the January 2025 Board meeting. Neither constitutes the type of decision that could render the action voidable.

Both Board meetings were regular meetings. Neither Delaware law nor the Company's charter or bylaws required that the Current Directors identify in advance

---

[405] *Compare Ghatty v. Mudili*, 2025 WL 2963154, at *1–2, *5–7 (Del. Ch. Oct. 21, 2025) (applying no-deception rule to special meeting where notice and agenda did not identify potential consideration of the removal of two directors from their officer positions and instead identified as an item for discussion the expansion of one of the director-officer's duties) *with Robnett v. Lithos Indus. Inc.*, 2024 WL 4836704, at *6 (Del. Ch. Nov. 20, 2024) (finding no deception where board met for a regular meeting, CEO-director began going through items of business, and directors then raised issue of his termination and acted on it; "Lithos did not violate Robnett's directorial information rights by not including termination of his employment on the board meeting agenda. Delaware law does not require as a general matter that directors be given advance notice of agenda items for regular board meetings. While a director cannot be affirmatively deceived into attending a regular board meeting, Robnett was not so deceived: he attended voluntarily and circulated his own agenda in advance." (footnotes omitted)).

[406] *See Ropko v. McNeill*, 2026 WL 732727, at *7–11 (Del. Ch. Mar. 16, 2026).

119

the issues they planned to raise at a regular meeting. Silence alone was therefore not enough. Under *Bäcker*, Arthur had to show an affirmative misrepresentation that those items would not be addressed, or a partial statement that, by material omission, implied that the items would not be addressed. He failed to establish either. The meetings were properly scheduled and convened. The issues were properly raised for discussion, and the Board took valid action.

### 3. The No-Exclusion Theory

Arthur also relies on the concept that board majorities act improperly by effectively conducting business outside of the board room so that the board meetings become empty formalities. On the facts presented, that theory fails as well.

The no-exclusion concept relies on *Lippman*, the same decision that forms the cornerstone of the no-deception line of authority, and rests on the same policy rationale of collective deliberation: "Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of their proposed action, and thus have produced a different result."[407]

---

[407] *Lippman*, 95 A. at 899 (citation omitted).

"[A]ll directors must have the opportunity to participate meaningfully in any matter brought before the board and to discharge their oversight responsibilities."[408]

When a subset of directors pre-meets a meeting such that the meeting becomes a rubber stamp, that principle is violated. That principle does *not* mean, however, that directors cannot confer outside of meetings, either with each other or with officers or advisors. It also does not mean that directors cannot gather information from corporate stakeholders. To the contrary, a board's deliberations benefit from the information that directors can gain from those discussions and which—to the extent the information is material to a board topic—they have an obligation to share with their fellow directors.[409] CEO-directors, for example, often speak with individual

---

[408] *OptimisCorp II*, 2016 WL 2585871, at *3 n.8 (cleaned up).

[409] *See HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (explaining that a director has "an unremitting obligation to deal candidly with fellow directors" (internal quotation marks omitted)); *see also Thorpe v. CERBCO*, 676 A.2d 436, 441–42 (Del. 1996) (stressing the importance of duty to be candid with fellow directors); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989) ("As the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests."); *see also Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 1342263, at *3 (Del. Ch. May 2, 2007) ("To satisfy his duty of loyalty, and its subsidiary requirement that he act in good faith, he needed to be candid with . . . his fellow board members . . . ."); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004) (finding director liable for breach of the fiduciary duty of loyalty for failing to "fulfill his obligation to be candid to his fellow directors"); *Int'l Equity Cap. Growth Fund, L.P. v. Clegg*, 1997 WL 208955, at *7 (Del. Ch. Apr. 22, 1997) (noting that directors owe a "duty to disclose to other directors"); *see generally* Laster & Zeberkiewicz, *supra,* at 45 (explaining that a director's failure "to provide information regarding the corporation to the board . . . may constitute a breach of fiduciary duty on the part of the . . . director[ ] responsible for the failure"); Am. L. Inst., *Principles of Corporate Governance: Analysis and Recommendations* § 5.02(a)(1) cmt. (1994),

directors or subsets of directors, and while that practice can generate difficulties, it is not inherently problematic.[410] Board or committee chairs and lead directors often take on more active roles that involve having conversations, gathering information, and providing real-time guidance, subject to reporting back to the board or committee

Westlaw (database updated Oct. 2024) ("A director or senior executive owes a duty to the corporation not only to avoid misleading it by misstatements or omissions, but affirmatively to disclose the material facts known to the director or senior executive.").

[410] *E.g.*, *Columbia Pipeline*, 299 A.3d at 469–70 ("The directors started falling short in December 2015, when Skaggs told three of the directors during his one-on-one meetings that TransCanada remained interested in a transaction. That disclosure should have caused each of the directors to perk up and ask questions. Had any of the directors done so, they would have learned that Poirier called Smith on December 19, during which, Poirier confirmed TransCanada's continuing interest in a transaction and implied that TransCanada was still interested in a deal at $28 per share. At that point, warning lights should have flashed, and the directors should have called a meeting and taken control of the process. Instead, they let Skaggs sweettalk them individually, and the Board did not receive any meaningful information about what Skaggs and Smith were doing until their next regularly scheduled meeting on January 28 and 29, 2016, when Skaggs reported Girling's expression of interest in a transaction in the range of $25 to $28 per share. Even then, the directors only heard what the management team wanted them to know."); *see id.* at 420 ("During the second half of December and through early January, Skaggs scheduled separate one-on-one meetings with individual Board members. There can be good reasons for a CEO to engage in one-on-one conversations with directors, but the practice invariably enhances the CEO's ability to curate the information each director receives and guide each director toward the CEO's preferred result. During one-on-one conversations, directors cannot benefit from hearing the questions that other directors ask, nor can they deliberate and share ideas. While not invariably problematic, individual meetings are a sign of a CEO seeking to control a process.").

for purposes of information sharing and formal action. Directors chat among themselves at board dinners, industry events, and in many other settings.

*Lippman* and the need for collective deliberation does not foreclose those discussions. A director who has been denied information by his fellow directors or corporate officers will likely be able to obtain it.[411] The director may be able to force a board to defer acting until the excluded director has been able to access and digest the information.[412] And the director or stockholder may be able to challenge decisions where the information asymmetry was extreme.[413]

Arthur argues that the Current Directors violated the non-exclusion principle by consulting with the sisters, by not inviting Carleton to the August 2024 alignment

---

[411] *See generally Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178 (Del. Ch. 2023); *In re WeWork Litig.*, 250 A.3d 901 (Del. Ch. 2020); *In re CBS Corp. Litig.*, 2018 WL 3414163 (Del. Ch. July 13, 2018); *Kalisman v. Friedman*, 2013 WL 1668205 (Del. Ch. Apr. 17, 2013).

[412] *See OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 702–03 (Del. Ch. 2014) ("Director Jason Taubman Kalisman, who voted against the recapitalization, and stockholder plaintiff OTK Associates, LLC obtained a preliminary injunction that temporarily blocked the recapitalization."); *id.* at 714 ("On May 13, 2013, the court heard argument on the plaintiffs' application for a preliminary injunction. On May 14, the court enjoined Morgans from implementing any of the Board resolutions passed on March 30 because of inadequate notice and other process failures.").

[413] *See P3 Health*, 2022 WL 16548567, at *33 ("It bears emphasizing that the degree of exclusion appears extreme. The court understands the fact that management often takes the lead role in developing and negotiating transactions. The court also understands that a controlling investor like Chicago Pacific frequently will be involved in the negotiations, while minority investors often will not. In this case, however, Hudson has alleged a pattern of conduct which, at the pleading stage, supports an inference of an intentional effort to negate the Hudson Managers' ability to participate in the governance of the Company.").

meeting, and by later engaging law firms and public relations firms on the Company's behalf without a formal meeting and without involving Shea. Those assertions are not sufficient to violate the no-exclusion principle.

Collins and Hachigian consulted with the sisters and their families and with each other, but they reported to the Board about what the sisters wanted. In fact, their reporting on those topics led Arthur and his boardroom allies to conclude that Collins and Hachigian were working for the sisters, when in fact they were exercising their good faith business judgment about what best served the interests of the Company and all of its stockholders.

Not including Carleton in the August 2024 alignment meeting did not violate the no-exclusion principle. If the Current Directors had decided during that meeting to adopt the items on the Issues List as mandates, then presented them and rubber-stamped them without permitting any debate and discussion, then Arthur would be on much stronger ground. But Hachigian presented the Issues List as topics for discussion, first among all of the directors and then with Arthur. As Arthur demonstrated at trial, the directors did not adopt the Issues List as a set of mandates, and the Issues List remained topics of discussion during the ensuing months and at the January 2025 meeting. For purposes of the no-exclusion principle, the Current Directors acted properly by introducing and discussing the Issues List with their fellow directors and Arthur.

The Current Directors' hiring of law firms and public relations firms was technically beyond the Current Directors' authority as directors, but the Executive

Committee and later the Board ratified those decisions. Those steps were not so significant as to violate the no-exclusion principle. When the Current Directors acted, they rationally believed that they had to act quickly to protect the Company and its stockholders.

The Current Directors did not improperly exclude Shea or Carleton. The Current Directors gathered information, presented information to the Board, and deliberated with their fellow directors during meetings. They acted properly.

## III. CONCLUSION

Arthur had the burden at trial to prove that a majority of the Current Directors acted in bad faith. He failed to carry his burden. The business judgment rule protects the Current Directors' decisions to suspend Arthur and his allies and subsequently to terminate Arthur. The court will enter judgment determining that Arthur's removal as President and CEO was valid.

The parties must confer and, within five days, submit a final order that is agreed as to form. If the parties cannot agree, then the parties must submit a joint letter presenting competing forms of order and explaining their disagreements. If there are additional issues that the court must address before a final order can be entered, then the parties must submit a joint letter identifying those issues and a proposed schedule for addressing them. This instruction seeks to ensure that the court has not overlooked any matters that the parties have already raised. It is not an invitation to raise new issues or seek a do-over.